938 F.2d 1390
 33 ERC 1699, 291 U.S.App.D.C. 131, 60
USLW 2098,
21 Envtl. L. Rep. 21,228
 HAZARDOUS WASTE TREATMENT COUNCIL and Laidlaw Environmental
Services, Inc., Petitioners,
v.
William K. REILLY, Administrator, U.S. Environmental
Protection Agency, and U.S. Environmental
Protection Agency, Respondents,
State of North Carolina and Friends of the Earth, et al., Intervenors.
 No. 90-1443.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 16, 1991.
Decided July 26, 1991.
 
 Petition for Review of an Order of the Environmental Protection Agency.
 David R. Case, for petitioners.
 W. Christian Schumann, Atty., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., and Joseph L. Friedman, Atty., E.P.A. ("EPA"), were on the brief, for respondents.
 Daniel F. McLawhorn, Sp. Deputy Atty. Gen. for North Carolina (for the State of N.C.), Rena I. Steinzor and David Kolker (for Friends of the Earth), and Thomas D. Schroeder (for Counties of Robeson and Scotland and City of Lumberton, North Carolina) were on the joint brief, for intervenors.
 John D. Runkle entered an appearance for intervenor Conservation Council of North Carolina, Inc.
 Before EDWARDS, BUCKLEY, and RANDOLPH, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 North Carolina has enacted a statute that requires a thousand-fold dilution of discharges from commercial hazardous waste treatment facilities into surface waters above public drinking water intakes. Petitioners contend that this legislation makes the State's hazardous waste treatment program inconsistent with programs administered by the federal government and other States and therefore ineligible for authorization under the Resource Conservation and Recovery Act. The Environmental Protection Agency concluded that its regulations did not require a finding that the North Carolina law was inconsistent and declined to withdraw authorization. We hold that the EPA's interpretation of its regulation is permissible and deny the petition for review.
 
 I. BACKGROUND
 
 2
 The Resource Conservation and Recovery Act ("RCRA") provides a comprehensive federal program for the management of hazardous waste but permits States to administer their own programs with the authorization of the EPA. See 42 U.S.C. Sec. 6926 (1988). The agency, however, may not approve a state program if
 
 
 3
 (1) such State program is not equivalent to the Federal program under this subchapter, (2) such program is not consistent with the Federal or State programs applicable in other States, or (3) such program does not provide adequate enforcement of compliance with the requirements of this subchapter.
 
 
 4
 Id. Sec. 6926(b). If a state program falls into one of these categories, the EPA must notify the State of the deficiency; and if it is not corrected within ninety days, the EPA "shall withdraw authorization of such program." Id. Sec. 6926(e). A State may nevertheless impose requirements that are more stringent than those established by EPA regulations. See id. Sec. 6929 ("Retention of State authority").
 
 
 5
 RCRA does not elaborate on the meaning of "consistent." That requirement, however, is addressed in section 271.4 of the EPA regulations:
 
 
 6
 To obtain approval, a State program must be consistent with the Federal program and State programs applicable in other States and in particular must comply with the provisions below....
 
 
 7
 (a) Any aspect of the State program which unreasonably restricts, impedes, or operates as a ban on the free movement across the State border of hazardous wastes from or to other States for treatment, storage, or disposal at facilities authorized to operate under the Federal or an approved State program shall be deemed inconsistent.
 
 
 8
 (b) Any aspect of State law or of the State program which has no basis in human health or environmental protection and which acts as a prohibition on the treatment, storage or disposal of hazardous waste in the State may be deemed inconsistent.
 
 
 9
 40 C.F.R. Sec. 271.4 (1990). The preamble to the regulations explains that just as a State's ban on interstate transport of hazardous waste could violate the commerce clause under City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), so could a ban on the treatment of waste:
 
 
 10
 A State that refuses entirely to allow a necessary part of national commerce--the disposal of hazardous wastes--to take place within its boundaries is impeding the flow of interstate commerce just as much as a State that refuses to allow the transportation of those wastes.... Accordingly, State programs which contain provisions that prohibit treatment, storage or disposal of hazardous waste within the State, will be deemed inconsistent if the prohibition has no basis in human health or environmental protection.
 
 
 11
 Consolidated Permit Regulations, 45 Fed.Reg. 33,290, 33,395 (1980).
 
 
 12
 Petitioners assert that North Carolina has created just such an inconsistency by enacting Senate Bill 114 ("Act"). The Act provides:
 
 
 13
 No permit for any new commercial hazardous waste treatment facility shall be issued or become effective ... until the applicant has satisfied the [North Carolina Department of Environment, Health, and Natural Resources] that such facility meets, in addition to all other applicable requirements, the following requirements:
 
 
 14
 ....
 
 
 15
 The facility shall not discharge indirectly through a publicly owned treatment works ... a hazardous or toxic substance into a surface water that is upstream from a public drinking water supply intake in North Carolina, unless there is a dilution factor of 1000 or greater, irrespective of any dilution occurring in a wastewater treatment plant, at the point of discharge into the surface water under 7Q10 [low flow] conditions.
 
 
 16
 ....
 
 
 17
 If [the EPA] concludes ... that any provision of this act will result in the withdrawal of approval of the North Carolina hazardous waste program, such provision is void.
 
 
 18
 N.C. Gen.Stat. Sec. 130A-295.01(b) (1989). Petitioners, Laidlaw Environmental Services, Inc., and the Hazardous Waste Treatment Council, charge that this provision is an attempt by North Carolina to shirk its share of a national burden: the treatment of hazardous wastes.
 
 
 19
 Laidlaw, formerly known as GSX Chemical Services, Inc., seeks to construct a large facility ("GSX facility") to treat liquid hazardous wastes in Laurinburg, North Carolina. More than half of these wastes would originate outside the State. While most treatment facilities can treat either organic or inorganic wastes but not mixtures of the two, the GSX facility represents a unique, state-of-the-art design that is capable of treating complex mixtures of both kinds by linking twelve different tank-based treatment processes in any combination. If left untreated, these wastes are generally disposed of by incineration or deep-well injection.
 
 
 20
 The GSX facility was designed to discharge up to 500,000 gallons of wastewater per day through a local, publicly owned treatment works that, in turn, discharges its wastewater into the Lumber River, about thirty miles upstream from the drinking water intake of Lumberton, North Carolina. The draft permit prepared under RCRA included conditions intended to safeguard Lumberton's drinking water.
 
 
 21
 Despite these conditions, senators representing local constituencies introduced a series of bills that would block construction of the plant. After the EPA warned that bills imposing a moratorium on the issuance of treatment-facility permits would jeopardize authorization of the State's hazardous waste program, the legislature adopted the existing bill.
 
 
 22
 In essence, Senate Bill 114 requires that a facility's discharge be diluted a thousandfold by the waters of the receiving river, without regard to any dilution that may have occurred prior to discharge. It does not apply to facilities downstream from public drinking water intakes or to facilities that do not discharge into surface waters. To be in compliance with the Act, a facility located at Laurinburg could discharge no more than 72,000 gallons a day. This limitation renders the proposed facility uneconomic.
 
 
 23
 In response to Senate Bill 114, GSX and the Hazardous Waste Treatment Council petitioned the EPA to withdraw approval of North Carolina's program. After informal investigation, the EPA commenced withdrawal proceedings. The EPA charged that because the statutory dilution requirement was arbitrary and failed to take into account the actual concentration of chemicals in the wastewater, the Act was not based on the protection of human health or the environment. The EPA also alleged that the Act would prohibit GSX and others from operating at Laurinburg and "numerous other locations within the State," thus "limit[ing] the ability of existing authorities of the State to be consistent with the federal program as set forth in 40 CFR 271.4." Order to Commence Proceedings, 52 Fed.Reg. 43,903, 43,905 (1987).
 
 
 24
 The Administrative Law Judge ("ALJ") determined that withdrawal of approval was not warranted. See Recommended Decision, Proceedings to Determine Whether to Withdraw Approval of North Carolina's Hazardous Waste Management Program (Apr. 11, 1990) ("ALJ Decision"). This determination rested on several conclusions. First, he found that Senate Bill 114 did not unreasonably restrict or operate as a ban on the free movement of hazardous waste across North Carolina's borders within the meaning of paragraph (a) of section 271.4 of the regulations. Second, he found that the Act did not fall within paragraph (b) because (1) it had a basis in human health and environmental protection; and (2) it did not prohibit the treatment of hazardous waste within the State because it permitted the construction of facilities of the capacity and type proposed by GSX at other locations within the State. Id. at 105, 99. The ALJ added that as paragraph (b) provides that a program in violation of its terms "may be deemed inconsistent," 40 C.F.R. Sec. 271.4(b) (emphasis added), a conclusion that the Act did fall within paragraph (b) would permit, but not require, withdrawal of authorization. ALJ Decision at 113.
 
 
 25
 The EPA's Regional Administrator adopted all of these conclusions with the exception of the ALJ's finding that Senate Bill 114 had a basis in the protection of human health and the environment, which he regarded as dictum and saw no need to address. The Administrator placed particular stress on the fact that paragraph (b) of section 271.4 contains two conditions, both of which must be satisfied to withdraw authorization for a state program; namely, the program must have no basis in human health or environmental protection, and it must "act[ ] as a prohibition on the treatment, storage or disposal of hazardous waste in the State." Decision (May 31, 1990) ("Final Decision") at 2-3. He concluded that the second condition had not been met because
 
 
 26
 under Senate Bill 114 a large facility of the type proposed by GSX for the Laurinburg site could be built elsewhere in the State, and a smaller facility could be built at Laurinburg. Therefore, the law cannot be said to act as a prohibition on the treatment, storage or disposal of hazardous waste in North Carolina.
 
 
 27
 Id. at 3. As the Regional Administrator acted pursuant to a delegation of final decisionmaking authority from the Administrator, his decision represents final agency action that is subject to judicial review under 5 U.S.C. Sec. 704.
 
 
 28
 While petitioners raise a number of issues, their basic argument is that the EPA erred by requiring, as petitioners see it, a total ban on the treatment of hazardous wastes within the State as a condition for the withdrawal of authorization, and by construing paragraph (b) of section 271.4 as providing the EPA with the discretion rather than the obligation to withdraw authorization if a state law or program meets the two conditions set forth in the regulation.
 
 II. DISCUSSION
 
 29
 Because the EPA is charged with the administration of RCRA, we defer to its interpretation whenever the statute is silent or ambiguous with respect to a specific issue. So long as the agency's interpretation is reasonable and consistent with the statutory purpose, we must uphold it. See, e.g., Chemical Mfrs. Ass'n v. EPA, 919 F.2d 158, 162-63 (D.C.Cir.1990) (citing Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984)).
 
 
 30
 A challenge to the EPA's interpretation of section 271.4 of its regulations is even more daunting. We must accept an agency's construction of its own regulations unless it is "plainly wrong," see Chemical Mfrs., 919 F.2d at 170 (internal quotes and citation omitted); that is, " 'plainly erroneous or inconsistent with the regulation,' " Udall v. Tallman, 380 U.S. 1, 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). That interpretation, of course, must also meet the test of consistency with the underlying statute.
 
 
 31
 The ultimate issue here is whether the Regional Administrator's interpretation of paragraph (b) of section 271.4 of the EPA regulations is permissible under RCRA. The paragraph reads as follows:
 
 
 32
 Any aspect of State law or of the State program which [ (1) ] has no basis in human health or environmental protection and [ (2) ] which acts as a prohibition on the treatment, storage or disposal of hazardous waste in the State may be deemed inconsistent.
 
 
 33
 40 C.F.R. 271.4(b) (bracketed numbers and emphasis added). Thus, under paragraph (b), two conditions must be met before authorization of a state program may be withdrawn.
 
 
 34
 Petitioners claim that the EPA considers a state law to "act as a prohibition" under the regulation only when it bans all treatment, storage, and disposal within a State, and they point to the ALJ's statement, based on his reading of the preamble to the regulations, 45 Fed.Reg. at 33,395, that the EPA "appears to have construed the phrase 'act as a prohibition' in [paragraph (b) ] as equivalent to an outright ban or refusal to accept hazardous waste for treatment, storage, or disposal." ALJ Decision at 112. Petitioners contend that the regulation must embrace any law that would even indirectly, as in the instant case, prohibit any treatment facility; otherwise, a State could accomplish a total ban one facility at a time. Senate Bill 114, they charge, epitomizes the "NIMBY" syndrome: In response to the needs of the nation for treatment of hazardous waste, North Carolina has simply said, "Not in my backyard." By refusing to respond, petitioners urge, the EPA ignores its duty to monitor state programs.
 
 
 35
 Although, at oral argument, government counsel attempted to defend the "ban on all treatment" position that petitioners ascribe to the EPA, that is not the basis on which the agency concluded that Senate Bill 114 did not act as a prohibition within the meaning of section 271.4(b). In explaining why the second condition of paragraph (b) had not been met, the Regional Administrator emphasized that of the 485 riparian miles available in North Carolina for a facility of the kind proposed by GSX, 333 remained available under the Act, and noted that a smaller plant could be built at the Laurinburg site. Final Decision at 2. We therefore construe the EPA's decision to mean that a state law "acts as a prohibition" on the treatment of hazardous wastes when it effects a total ban on a particular waste treatment technology within a State, and nothing more.
 
 
 36
 Such a construction is reasonable and merits deference. The language of paragraph (b), which uses the word "prohibit[ ]" rather than "impede[ ]" or "restrict[ ]" as in the case of paragraph (a), suggests that the former allows States greater latitude in regulating particular treatment facilities before a prohibition is found to exist. This is consistent with the preamble's expression of a desire to encourage the development of state programs by avoiding the establishment of "very tight standards." See 45 Fed.Reg. at 33,385. Second, defining prohibition in terms of the ban of a particular technology falls well within the language of paragraph (b). Finally, we see nothing inconsistent between this construction and the language of the underlying statute, 42 U.S.C. Sec. 6926(b), which merely asserts that a state program may not be authorized if "such program is not consistent with the Federal and State programs applicable in other States." This language allows the agency enormous latitude in structuring its own implementing regulations and in interpreting them.
 
 
 37
 Petitioners maintain, nevertheless, that the EPA cannot reconcile its interpretation with RCRA's requirement of consistency among federal and state waste management programs. See id. They point out that, under RCRA, the EPA's regulations governing the location of a waste treatment facility must be based on what is "necessary to protect human health and the environment." See id. Sec. 6924(a). From this, petitioners argue that a state law that regulates siting cannot be sustained as "consistent" with the federal program unless the State, too, can demonstrate a basis for the restriction in the protection of human health or the environment.
 
 
 38
 While it is true that RCRA requires "consistency" between state and federal programs, it does not mandate uniformity; in fact, the statute expressly reserves to States the authority to impose site-selection standards that are "more stringent" than those imposed by federal authority. See 42 U.S.C. Sec. 6929. Consequently, the Regional Administrator's ruling that the North Carolina statute could be found "consistent" with federal law without any consideration of its basis in health or environmental protection was not in conflict with the federal statutory scheme.
 
 
 39
 We also reject petitioners' contention that the ALJ, whose opinion was adopted by the Regional Administrator in relevant part, failed to defer to the EPA's prior interpretation of paragraph (b). Petitioners refer to the agency's repeated warnings that it might withdraw North Carolina's authorization when asked its opinion on earlier versions of Senate Bill 114, the allegations made by the agency in initiating the withdrawal proceedings, and the testimony at the withdrawal hearings of the Chief of the Oversight Section of the EPA's State Programs Branch.
 
 
 40
 These statements and allegations, however, do not constitute a definitive position with a direct and immediate impact on the rights of petitioners such that they represent a final statement of the agency's position. See Her Majesty the Queen in Right of Ontario v. EPA, 912 F.2d 1525, 1531 (D.C.Cir.1990). Neither the representations of subordinate officials nor the instigation of enforcement proceedings constitutes final agency action for the purpose of judicial review. See, e.g., FTC v. Standard Oil Co., 449 U.S. 232, 241, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (stating that an agency's issuance of a complaint "is not a definitive statement of position" but rather "represents a threshold determination that further inquiry is warranted"); American Paper Inst., Inc. v. EPA, 882 F.2d 287, 288 (7th Cir.1989) (stating that advisory statements made by subordinate officials do not constitute final agency action for purposes of judicial review).
 
 
 41
 In this case, the withdrawal proceedings were instigated "to consider the concerns expressed by EPA and the allegations raised by the petitioners." Order to Commence Proceedings, 52 Fed.Reg. at 43,906. To that end, hearings were held, testimony taken, and a final adjudication rendered by the Regional Administrator. His interpretation of paragraph (b) is the final agency action we have been asked to review.
 
 
 42
 Finally, petitioners challenge the EPA's conclusion that withdrawal of federal authorization of a state program under paragraph (b) of section 271.4 is discretionary. The agency based its conclusion on the use of "may" in paragraph (b) as contrasted with the use of the mandatory "shall" in paragraph (a). Final Decision at 2-3. Petitioners, on the other hand, argue that when a state program is found to be inconsistent, authorization must be withdrawn, citing the language of 42 U.S.C. Sec. 6926(e) ("the Administrator shall withdraw authorization"). Because this case did not turn on an exercise of discretionary authority, we have no need to reach this question.
 
 III. CONCLUSION
 
 43
 We construe the Regional Administrator's decision in this case as holding that Senate Bill 114 did not act as a prohibition on the treatment of hazardous wastes within the meaning of 40 C.F.R. Sec. 271.4(b) because it did not effect a statewide ban on the use of the GSX waste-treatment technology. We find this interpretation to be both consistent with the language of the regulation and permissible under RCRA. We conclude, on that basis, that the EPA properly declined to withdraw authorization of North Carolina's program. The petition for review is therefore
 
 
 44
 Denied.