**LAFARGE CORPORATION, Plaintiff,**

v.

**William R. CAMPBELL, Executive Director of the Texas Air Control Board, and Jesus Garza, Executive Director of the Texas Water Commission, Defendants.**

**Civ. No. A–92–CA–079.**

United States District Court,
W.D. Texas,
Austin Division.

Feb. 3, 1993.

James E. Cousar, Jerry M. Keys, Howard L. Gilberg, Becky L. Jolin, Thompson & Knight, Austin, TX, for plaintiff.

Linda B. Secord, Atty. Gen. of Texas, no pro hac vice, Thomas H. Edwards, Austin, TX, for defendants.

**AMENDED [1] MEMORANDUM OPINION and ORDER**

SPARKS, District Judge.

The issue before the Court in the above-styled and numbered cause is whether or not the denial of Lafarge's permit application to burn hazardous waste-derived fuel in its cement kiln because of the existence of an established residence within one-half mile of the kiln, pursuant to Section 1.17 of Senate Bill 1099 ("S.B. 1099" or "the siting prohibition"), is unconstitutional. According to Lafarge, the Texas siting prohibition is preempted by the Resource Conservation and Recovery Act ("RCRA") and EPA's Boiler and Industrial Furnaces regulations ("the BIF rules"); unduly burdens interstate commerce in violation of the Commerce Clause; and violates Lafarge's right to equal protection by impermissibly distinguishing between commercial and noncommercial hazardous waste management facilities. Naturally, the State disagrees. According to the State, S.B. 1099 is merely a "more stringent" requirement, expressly permitted under RCRA,[2] which acts as a margin of safety protecting human health and safety from fugitive emissions and in the event of "upsets", spills, or other unanticipated events which could cause emissions to exceed those permitted under normal operating conditions. After three hearings and review of many exhibits, pleadings, and cases, the Court concludes that S.B. 1099 is not unconstitutional as applied to Lafarge.

## I. Procedural and Legislative History

LaFarge filed its original complaint and application for temporary restraining order on February 4, 1992, requesting the Court to declare that the siting prohibition violates Lafarge's rights under the Supremacy, Commerce, and Equal Protection Clauses of the Constitution and requesting that the Court enjoin the Executive Director of

---

1. No substantive changes to the December 23, 1992 Memorandum Opinion and Order have been made. This amended order simply contains spelling and gender corrections in footnote 24.

2. 42 U.S.C. § 6929.

the TACB (and now TWC) from enforcing the siting prohibition and order Lafarge's TACB permit application reinstated.[3] The Court denied the application for temporary restraining order at that time based upon Lafarge's failure to complete its administrative appeal of the Director's decision. On June 18, 1992, the Board, as predicted, upheld the Director's Summary Denial of Lafarge's application. On July 9, 1992, twelve calendar days before the previously set July 21, 1992 hearing date, Defendants filed a Motion to Dismiss or in the Alternative for Summary Judgment asking for, amongst other things, this Court to abstain and let the agency (Texas Air Control Board) rule on Lafarge's Motion for Rehearing and/or let the Texas state courts rule on the proper interpretation of the challenged statute, S.B. 1099.

S.B. 1099 is a straightforward statute. Under its provisions, a new commercial hazardous waste management facility, such as the cement kiln at the Balcones Plant, can not receive a permit from the TWC or TACB if it is within one-half mile of certain structures, including "established residence[s]." Tex.Health & Safety Code § 361.102(b) ("S.B. 1099"). In this case, Lafarge's Balcones Cement Plant is located within one half mile of three established residences and therefore cannot receive a permit to burn hazardous wastes. Believing the statute to be unambiguous, the Court did not abstain but did dismiss all of the then Defendants except the current Executive Director of the Texas Air Control Board, William Campbell.

On July 21, 1992, the Court held a hearing at which both parties presented a substantial amount of testimony. Following the presentation of evidence at the July 21, 1992 preliminary injunction hearing, the Court had sufficient evidence to rule on the merits of LaFarge's suit against Texas Air Control Board Executive Director William Campbell and was prepared to do so. However, being apprised of no need for urgent action, the Court asked the Defendants' counsel if her client would like an opportunity to present evidence on the reasonable

bases for S.B. 1099. Defendants' counsel answered affirmatively, and, based upon that representation, the Court refrained from issuing a final ruling and instead simply denied Lafarge's motion for preliminary injunction. Accordingly, the case was set for a final hearing at 9:00 a.m., August 19, 1992.

At 8:30 a.m., August 19, 1992, Defendants' counsel presented the Court with TACB's Emergency Motion for Leave to File Motion to Dismiss for Mootness, to Shorten Time for Response, and to Hear the Motion on the Day of Trial. This motion was based on new Texas Water Commission regulations, which took effect on July 28, 1992, twenty-two (22) days before the August 19 hearing date.

The new Texas Water Commission (TWC) regulations state in part:

> The owner or operator of a hazardous waste or solid waste management facility is *not* required to obtain a permit from any agency of the state *other than the [Texas Water C]ommission* to store, process, treat, dispose of, or destroy solid waste or hazardous waste …

Tex.Health & Safety Code § 361.071 (emphasis added). Accordingly, Lafarge joined Jesus Garza, Executive Director of the Texas Water Commission as a defendant although the Commission has, of course, not yet ruled on a permit application by LaFarge.

Finally, at 4:38 p.m. on August 28, 1992, a Friday and six days before the Court's resetting of the final hearing on September 3, 1992, Defendant Garza filed a Motion for Continuance and Motion to Dismiss for Failure to State a Claim. According to Garza, Lafarge's suit to have its air permit application reinstated was moot, and as Lafarge has not been denied a water permit by the Texas Water Commission ("TWC"), Lafarge's suit against the TWC was not yet ripe.

Having concluded that forcing Lafarge to once again jump through all the regulatory hoops of applying for a permit from the TWC, having the application denied,

---

**3.** Jesus Garza, Executive Director of the TWC    was not a defendant in the original suit.

appealing, and so on, would be "a useless thing," and recognizing that had the Court ruled prior to July 28, 1992, Lafarge and the TWC would have been bound by the Court's ruling in any event, the Court declined to grant Defendant Garza's Motion to Dismiss and proceeded with the final hearing on September 3, 1992. The Court formally denies Defendant Garza's August 28, 1992 Motion to Dismiss at this time.

## II. *Lafarge's Cement Kiln at the Balcones Plant*

Lafarge is a Maryland corporation with its principal place of business in Virginia. Lafarge is qualified to do business in Texas and owns and operates the Balcones Plant in Comal County, Texas, which manufactures Portland cement. In 1988, when the application for authorization to burn hazardous waste-derived fuel ("HWDF") at the Balcones Plant was first filed with the TACB, the plant was owned by General Portland, Inc. After taking over the ownership and operation of the Balcones Plant, Lafarge filed a revised application with the TACB on May 31, 1990.

Prior to filing the application with the TACB, General Portland filed a separate application with the TWC for a separate permit to receive, store, blend and handle HWDF at the Balcones Plant. In 1988, Systech Environmental Corporation ("Systech"), a Delaware corporation and wholly owned subsidiary of Lafarge, replaced General Portland as the applicant on the TWC permit application. Thus, the permit application at issue in this case is only for the burning of HWDF, not for transporting, receiving, storing, blending, or handling HWDF.[4]

The primary business of the Balcones Plant is the manufacture of Portland cement. The plant produces cement in a preheater, pre-calciner rotary kiln ("kiln") in which limestone, clay, and other raw materials are heated to temperatures in excess of 2,500 degrees Fahrenheit. The principal fuels and heat sources for the kiln are coal and petroleum coke, but the kiln can also burn natural gas, fuel oil, and shredded waste tires. All of these except shredded waste tires are "conventional fuels." In addition, the kiln has the technical capacity to burn HWDF.

The end product of the kiln process is a material called "clinker," a fused solid which is ground into Portland cement. In addition, the kiln emits kiln dust and combustion gases from the burning of fuel. Before exiting the main plant stack, combustion gases travel through the plant's feed recovery and air pollution control systems.

Cement kilns are one of several systems which have the technical capability to burn hazardous waste as fuel.[5] In Texas, however, cement kilns are the only systems which provide commercial capacity for the burning of hazardous waste as fuel. *Defendant's Exhibit 1* (Needs Assessment for Hazardous Waste Commercial Management Capacity in Texas, February 28, 1992), Appendix 1–2, para. 6. HWDF is derived from a variety of liquid wastes, including spent solvents, used oil, printing inks and hydrocarbon-based waste generated by the electronics, aerospace, automotive, coatings, petroleum, and petrochemical industries. Cement kilns that burn HWDF use it as a partial substitute for conventional fuels. For instance, in its permit application, Lafarge proposes to use HWDF for 50% of its fuel needs at the Balcones Plant.

Lafarge owns and operates several cement kilns in the United States which already burn HWDF as a supplemental fuel. Systech operates facilities that provide HWDF as supplemental fuel for six other cement plants in the United States, four of

---

4. Although Systech is not a party in this case, because of its close relationship with Lafarge and the Balcones Plant, and because many of the emissions and events which the siting prohibition is intended to guard against are primarily associated with Systech's operations, the parties presented extensive evidence regarding Systech and its proposed facility at the Balcones Plant.

5. Other systems which can burn HWDF include, but are not limited to, blast furnaces, coke ovens, sulfur recovery furnaces, smelting, melting and refining furnaces, and industrial boilers. *Defendant's Exhibit 1* (Needs Assessment for Hazardous Waste Commercial Management Capacity in Texas, February 28, 1992), Appendix 1–2, para. 6.

which are owned and operated by Lafarge and five of which would be prohibited from burning HWDF under the siting provision of S.B. 1099.

### III. *Federal Regulations— the BIF Rules*

On August 21, 1991, while Lafarge's permit application to burn HWDF was pending, the Boiler and Industrial Furnace Regulations ("BIF rules") became effective. The BIF rules were promulgated by the Environmental Protection Agency ("EPA"), pursuant to the Resource Conservation and Recovery Act ("RCRA"), to govern the burning of HWDF in cement and lime kilns and other industrial furnaces. *See* 40 C.F.R. Part 266, Subpart H (1992); *see also* 42 U.S.C. § 6924(q) (1992 Supp.). Prior to the enactment of the BIF rules, there were no federal RCRA restrictions on the burning of HWDF in cement kilns as burning hazardous waste as fuel was considered recycling, which was not regulated.[6]

The BIF rules primarily limit the amount of emissions that may be emitted by boilers or industrial furnaces (including cement kilns) burning hazardous waste.[7] *See* 40 C.F.R. § 266.102(c). A cement kiln operator wishing to burn HWDF must perform "dispersion modelling,"[8] which is a site-specific assessment taking into account factors such as stack height, temperatures, terrain, information about nearby structures and so on. *See* 40 C.F.R. § 266.104(e)(3), 266.106(h), 266.107(g) (new facility); 40 C.F.R. § 266.103(b)(2)(v) (interim status).[9] As a result of such dispersion modelling, one can discern in which direction and how rapidly emissions from the kiln will spread and what the ground level concentrations of various pollutants will be. In addition to modelling, a "trial burn" is performed, from which the window of operation is derived and made a part of the facility's permit. *See* 40 C.F.R. § 266.102(d)(4)(iv) (new facility); 40 C.F.R. § 266.102(d)(3), § 270.66(g) (interim status).

From the dispersion modelling, the point of "maximum impact" is determined. *See* 40 C.F.R. § 266.104(e)(3), 266.107(h) (new facility); 40 C.F.R. § 266.103(b)(v)(B)(4) (interim status). It is at this point that the maximum annual [10] average off-site ground level concentration of pollutants emitted from the kiln stack will be greatest. The point of maximum impact of such stack emissions is generally between 0.8 and 2.5 miles from the kiln. At the Balcones Plant, the point of maximum impact is 2.1 miles from the kiln.

The EPA has established standards for various categories, which standards the EPA has determined will adequately pro-

---

**6.** This is true despite the fact that in 1984 Congress directed the EPA to promulgate regulations establishing standards for the burning of hazardous waste as fuel by November 8, 1986. *See* 42 U.S.C. § 6924(q)(1) (1992 Supp.).

**7.** Generators, transporters, and handlers of hazardous waste, as well as facilities storing hazardous waste, are also extensively regulated under other parts of the Code of Federal Regulations. *See e.g.,* 40 C.F.R. Part 262 (generators); 40 C.F.R. Part 263 (transporters); 40 C.F.R. Part 264 (storage). Thus, a facility like Systech would not come under the BIF rules.

**8.** There are three "tiers" under the BIF rules. Under Tier Three, a BIF facility must actually perform site-specific dispersion modelling as opposed to agreeing to be restricted to narrower confines according to more general modelling. By performing the site-specific modelling, a BIF facility can obtain a wider latitude in the burning of HWDF than it could under Tier One, where no modelling or test burn is required, or under Tier Two, where no modelling is required but test burning is required. Lafarge is seeking

a permit for the Balcones Plant kiln under Tier Three.

**9.** The requirements for obtaining a permit to burn HWDF vary somewhat depending on whether a facility qualifies for "interim status." EPA only very recently notified Lafarge it qualified for interim status, having previously determined Lafarge did not qualify for interim status. However, as the TACB's determination that Lafarge was a "new commercial hazardous waste management facility" for purposes of S.B. 1099 § 1.17 is not affected by the EPA's granting of interim status to Lafarge, the outcome of this lawsuit is not affected by this change in status. *See* Plaintiff's Exhibit 7 (January 17, 1992 letter from TACB Executive Director Steve Spaw denying permit application on basis of siting prohibition); Plaintiff's Exhibit 8 (TACB order upholding January 17, 1992 decision); Tex.Health & Safety Code Ann. § 361.102(b) and accompanying Historical and Statutory Notes.

**10.** The BIF rules do not require modelling for short-term impacts of emissions.

tect the health of the "maximum exposed individual" ("MEI") from cumulative exposure and resulting risk. For the purposes of establishing these standards, the MEI is assumed to live at the point of maximum impact, twenty-four hours a day for seventy years. The categories for which EPA standards are set under the BIF rules are as follows:

(1) destruction and removal efficiencies of principal organic hazardous constituents (99.99%); see 40 C.F.R. § 266.104.

(2) air emissions of organic products of incomplete combustion; see 40 C.F.R. § 266.112; 40 C.F.R. part 266, Appendix VIII.

(3) air emissions of particulate matter; see 40 C.F.R. § 266.105.

(4) air emissions of ten metals (soon to be twelve), see 40 C.F.R. § 266.106; and

(5) air emissions of acid gases. See 40 C.F.R. § 266.107.

Except for the standard for air emissions of particulate matter, which is based on visibility, each of the above standards is based upon calculations establishing the level of emissions to which the MEI can be exposed without exceeding the maximum acceptable level of risk as established by the EPA.

In addition, the BIF rules establish operating requirements to control fugitive emissions;[11] require visual inspections, monitoring, and leak-detection sensors; and require daily visual inspections of industrial furnaces and all associated equipment for leaks, spills, fugitive emissions, and signs of tampering. 40 C.F.R. § 266.102(e)(7) (new facility); 40 C.F.R. § 266.103(j) (interim status). The BIF rules incorporate design, construction, maintenance and operational requirements to minimize the risks of fire, explosion, or upsets, and require BIF facilities to maintain contingency planning requirements in the event a fire, explosion, or upset does occur. See 40 C.F.R. § 266.102(a) (new facility); 40 C.F.R. § 266.103(a)(4) (interim status). For instance, in the event operating conditions deviate from those established in the facility's permit (i.e., an upset occurs) at a kiln, the BIF. rules require automatic cut off devices, which would immediately prevent any more HWDF from being fed into the kiln. 40 C.F.R. § 266.102(e)(7)(ii); 40 C.F.R. § 266.103(g) (interim status).

The BIF rules do not, however, establish standards for emissions of fugitive emissions or emissions resulting from upsets or spills, which are, of course, unpredictable. Nor do the BIF rules regulate every possible air contaminant. Nonetheless, if a BIF facility elects to meet the "hydrocarbon" limit, as "virtually all" cement kilns do, it can only emit 20 parts per million (ppm) of hydrocarbons, which includes all organic compounds whether on the list of BIF regulated organic compounds (Appendix VIII) or not. Testimony of John Chadbourne, Director of Environment and Industrial Hygiene for Lafarge Corporation, at 215–16 (Sept. 3, 1992 transcript); 40 C.F.R. § 266.-104(c) (new facility); 40 C.F.R. § 266.-103(c)(1)(v) (interim status). Furthermore, there is an omnibus provision in the BIF rules which allows a permit writer to evaluate any other parameters protective to human health and the environment.[12] See 40 C.F.R. § 270.32 (applies to all RCRA permits).

## IV.  Texas Regulations

Texas, through the Texas Air Control Board ("TACB") and the Texas Water Commission ("TWC"), also regulates boilers and industrial furnaces and requires them to obtain state permits to operate and burn hazardous waste. Congress expressly acknowledges this right of states to regulate in the area of waste management:

---

11. Fugitive emissions are emissions which escape into the atmosphere through other than a stack, chimney, vent, or other opening designed to direct or control the flow of emissions. Thus, in the case of a cement plant, fugitive emissions would not be included in the calculations used to determine the point of maximum impact and the MEI as only stack emissions are measured during modelling required under the BIF rules.

12. The example contemplated at the July 21, 1992 hearing was location of a kiln seeking to burn HWDF within two miles of a hospital specializing in asthma or respiratory illness. See Sept. 3, 1992 transcript, at 214–15.

Nothing in this chapter [Solid Waste Disposal] (or in any regulation adopted under this chapter) shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, *including* those for *site selection,* which are *more stringent* than those imposed by such regulations.

42 U.S.C. § 6929 (1992 Supp.) ("the savings clause") (emphasis added). In fact, a state may seek and obtain authorization to administer and enforce a hazardous waste program, which program is carried out in lieu of the federal program. 42 U.S.C. § 6926 (1992 Supp.); 40 C.F.R. § 271.3 (1991).[13] Texas, however, has not yet sought nor received such authority to administer the BIF program, although Texas is authorized to administer other programs involving solid waste. Thus, at this time, a facility such as Lafarge's Balcones cement plant must obtain a permit to burn HWDF from the EPA and from the TWC.[14]

While Lafarge probably could meet all of the requirements under the BIF rules to obtain a Federal permit to burn HWDF, the siting prohibition established by Senate Bill 1099 and signed into law on June 7, 1991, prohibits Lafarge from obtaining a permit (from the TACB or TWC) to burn HWDF under any circumstances.[15] The siting prohibition reads as follows:

The [Texas Water C]ommission and the Texas Air Control Board by rule *shall prohibit* the issuance of a permit for a new commercial hazardous waste management facility or the subsequent areal expansion of such a facility or unit of that facility if the boundary of the unit is to be located within one-half of a mile (2,640 feet) of an *established residence,* church, school, day care center, surface water body used for a public drinking water supply, or dedicated public park.

Tex.Health & Safety Code § 361.102(b) ("S.B. 1099") (emphasis added); *see also* 31 Tex.Admin.Code § 335.205(c) (TWC);[16] According to the State, while the BIF rules establish standards for normal operation of an industrial furnace, they do not go far enough to protect human health and safety in the event an accidental release, upset, spill or other abnormal event occurs. The siting prohibition thus provides a buffer zone for protection during such times and obviates the need for evacuation of local residents living within one-half mile of the Balcones Plant.

In addition to this "buffer zone," the TACB and TWC have several other means by which to ensure the health and safety of Texas residents. Before issuing a permit to burn HWDF, these agencies may consider past performance and compliance with federal and state law and with permit conditions. *See* Tex.Health & Safety Code § 382.0518. They may consider land use compatibility,[17] *id.* § 361.069; they may regulate compounds not regulated under the BIF rules; and they may otherwise address every risk and deny any permit for

---

**13.** "To obtain approval, a State program must be *consistent* with the Federal program...." 40 C.F.R. 271.4 (1991) (emphasis added).

**14.** Recall that Lafarge sought only to obtain a permit to burn HWDF from the TACB up until July 29, 1992, when Texas adopted its BIF regulations, which, apparently, require Lafarge to now seek such a permit from the TWC alone. *See* 17 Tex.Reg. 2583 (1992), *adopted* 17 Tex. Reg. 5020 (1992) (effective July 28, 1992) (to be codified at 31 Tex.Admin.Code §§ 335.221–29); Tex.Health & Safety Code § 361.071 (Vernon 1991).

**15.** Lafarge could, of course, seek to purchase the three established residences located within one-half mile of the cement kiln at its Balcones Plant, but, given the quite vocal opposition expressed by most residents in New Braunfels and near the Plant, this may or may not be a viable

option. As for moving the kiln, the evidence was undisputed that one does not "move" a kiln.

**16.** The TACB has determined that Lafarge's cement kiln is a "new" facility for purposes of S.B. 1099 as it has never actively burning HWDF. Lafarge's appeal of the decision was based on its contention that burning tires as fuel, which the kiln's permit had been amended to allow, qualifies as burning HWDF, but the TACB Board upheld the original decision classifying Lafarge's cement kiln at the Balcones Plant as a new commercial facility subject to S.B. 1099.

**17.** It is interesting to note that one of the factors the TWC may take into account when determining land use compatibility is the "distance from the site boundary to existing structures." 16 Tex.Reg. 6070 (1991) (to be codified at 31 Tex.Admin.Code § 335.180).

reasons relating to public health or pollution of the air or water. *See id.* §§ 361.-089, 382.0518. In addition, the TACB requires modelling for fugitive emissions, whose impact is greatest much closer to the source than kiln emissions, and requires modelling for shorter time intervals in addition to the maximum annual average required to be determined under the BIF rules.[18]

### V. *Federal Preemption*

■■■ One of the three primary issues in this lawsuit is whether or not S.B. 1099 violates the Supremacy Clause of the United States Constitution as applied to Lafarge under the circumstances described above. The Supremacy Clause preempts state law in three instances. First, Congress can explicitly preempt state law by way of explicit statutory language. *English v. General Elec. Co.*, 496 U.S. 72, 78–80, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). Second, preemption of state law may be inferred when federal regulation is so pervasive that one may infer Congress intended the federal government to occupy the field exclusively. *Id.* (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Finally, and most importantly for purposes of analysis in this case, state law is preempted to the extent it actually conflicts with federal law.[19] *Id.; Hillsborough County, Fla. v. Auto. Med. Labs,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillsborough,* 471 U.S. at 713, 105 S.Ct. at 2375 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10

L.Ed.2d 248 (1963); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

■■ Congress obviously did not intend RCRA to preempt all state law governing the disposal of hazardous waste. Section 6929, Title 42, United States Code, provides, in part:

> [N]o State or political subdivision may impose any requirements less stringent than those authorized under this subchapter respecting the same matter.... [However, n]othing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing *any* requirements, including those for *site selection,* which are *more stringent* than those imposed by such regulations.

42 U.S.C. § 6929 (West 1992 Supp.) (emphasis added). Congress clearly intended states to continue regulating hazardous waste so long as their regulations are at least as stringent as those promulgated by the EPA. Furthermore, it is more difficult to find preempted state laws and regulations concerning health and safety as these matters are "historically [ ] a matter of local concern." *Hillsborough,* 471 U.S. at 719, 105 S.Ct. at 2378. Thus, the issue before this Court is whether or not S.B. 1099 is a "more stringent" and permissible law to protect human health and safety or whether it is an irrational law in actual conflict with the recently promulgated BIF rules.

According to Lafarge, the siting prohibition in S.B. 1099 has no rational scientific basis and obstructs Congress's goal in RCRA to encourage new and improved methods of resource conservation and recycling of hazardous waste. *See* 42 U.S.C. § 6902.[20] In addition, Lafarge argues that

---

**18.** According to several of the State's witnesses, modelling for maximum emissions over shorter time periods is necessary to determine the risk of more acute effects, such as eye and skin irritation and coughing. In contrast, maximum annual averages are used to determine the risk of suffering more chronic disorders, such as cancer.

**19.** The Supreme Court has "held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough County, Fla. v. Auto. Med. Labs.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

**20.** Section 6902, Title 42, United States Code describes the objectives of RCRA and national

it is virtually impossible for it to comply with both the BIF rules and S.B. 1099. Therefore, Lafarge contends, the siting prohibition, as applied to Lafarge, conflicts with and is preempted by federal law and regulations.

As discussed previously, the BIF rules are risk-based and primarily establish limits for various types of stack emissions produced when hazardous .waste is burned in boilers and industrial furnaces. Because the BIF rules look at actual exposure and S.B. 1099 looks only at an "arbitrarily" chosen distance, unrelated to exposure, Lafarge argues S.B. 1099 is irrational and inconsistent with the risk-based BIF rules. In support, Lafarge correctly points out that persons within a half-mile of the kiln would be less exposed to stack emissions than persons two miles from the kiln.

This does not, however, mean that persons within one-half mile of the kiln would always be less exposed to all emissions all of the time. As the State reiterated again and again, fugitive emissions and emissions resulting from spills and upsets in the kiln's operation have a much greater impact close to the kiln than do stack emissions.[21] And, although the State is free to model for and regulate any such emissions, by their very nature, spills and upsets are unpredictable.[22] The requirements for visual inspections, automatic cutoffs, contingency plans for emergencies, and other precautionary measures established by the BIF rules add a significant layer of protection but do not eliminate all possibility of a spill or upset taking place. Thus, although not derived from any scientific or mathematical calculations, the half-mile buffer zone, based in part on evacuation zones used in other types of emergencies, would add yet another layer of protection in the event such an emergency did take place and is not irrational.

M. Ray Perryman, an expert testifying on behalf of Lafarge also stated there are no physically and economically viable locations in Texas at which to build new cement kilns. *See Plaintiff's Exhibit, #24.* Factors listed to be considered when deciding where to locate a new cement kiln include availability of reasonably soft limestone deposits; access to highways and railroads; access to power lines and natural gas; access to clay reserves; and proximity to cities or towns. Looking only at physical factors, four locations would be available in Texas. *Id.* However, Mr. Perryman further concluded that there were no locations in Texas where all physical requirements could be met and at least a 10% rate of return be realized. *Id.*

Not only does this not meet the "physical" impossibility standard described in Supreme Court cases discussing actual conflicts between state and federal laws, *see e.g., Hillsborough,* 471 U.S. at 713, 105 S.Ct. at 2375, but Mr. Perryman also neglected to include large areas of Texas in which the limestone, although not ideal, may be, and has been in the past, used by cement kilns. *See Defendant's Exhibit #26.* Furthermore, Edwin R. Warren, one

---

policy with respect to the same. Relevant portions of that section include:

> The objectives of this chapter are to promote the protection of health and the environment and to conserve valuable material and energy resources by—
>
> (6) minimizing the generation of hazardous waste and land disposal of hazardous waste by *encouraging process substitution,* materials recovery, properly conducted *recycling and reuse* and treatment;
>
> .    .    .    .    .
>
> (10) *promoting* the demonstration, construction, and application of solid waste management, *resource recovery,* and *resource conservation* systems which preserve and enhance the quality of air, water, and land resources; and

> (11) establishing a cooperative effort among the Federal, State, and local governments and private enterprise in order to *recover valuable materials and energy from solid waste.*

42 U.S.C. § 6902(a) (West Supp.1992) (emphasis added).

**21.** Lafarge also stressed the fact that 99.5% of fugitive emissions at the Balcones Plant will come from the Systech facility, which is not prohibited from managing hazardous waste under S.B. 1099 because there are no S.B. 1099 structures within one-half mile of its boundary, and the fact that the risk of spills would be greatest at the Systech facility.

**22.** Recall the TACB does require modelling for fugitive emissions.

of Lafarge's own experts testified that his survey of twenty-four [23] existing kilns in Texas revealed that at least four [24] did not have any S.B. 1099 structures within one-half mile. *See Plaintiff's Exhibit* # 16. Thus, although limited, there are existing kilns in Texas which could meet the requirements of S.B. 1099 and there are sites where location of a hazardous waste burning kiln is physically possible.

Nonetheless, Lafarge maintains that because the siting prohibition significantly limits the siting of hazardous waste burning kilns, a preferred recycling technology, and prohibits its Balcones Plant from burning HWDF, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as set out in RCRA and the BIF rules and is preempted. *See Hillsborough,* 471 U.S. at 713, 105 S.Ct. at 2375. While Lafarge clearly has good reason to contest this statute and good reason to believe it was not passed without Lafarge in mind,[25] the Court cannot find from the evidence presented that the siting prohibition actually conflicts with federal law. The Court reaches this conclusion because the siting prohibition in S.B. 1099 does not completely prohibit the burning of HWDF in cement

kilns in the State of Texas and because it has, at least ostensibly, a rationale basis in that it creates a buffer zone in the event a kiln experiences an upset, spill or other event causing the kiln to digress from its normal operation.

Several district courts and courts of appeal have grappled with this or a similar issue, reaching the same conclusion: if application of the law or regulation does not result in an absolute prohibition of a type of technology or prohibit importation of hazardous waste, federal law does not preempt it. For instance, the Eighth Circuit Court of Appeals found a county ordinance *"prohibiting* the storage, treatment, or disposal of 'acute hazardous waste' within its boundaries" preempted by RCRA. *Ensco, Inc. v. Dumas,* 807 F.2d 743, 744–45 (8th Cir.1986) (emphasis added); *see also Warren County v. State of N.C.,* 528 F.Supp. 276, 288–90 (E.D.N.C.1981) (county ordinance prohibiting storage, dumping or disposal of PCBs in county preempted by Toxic Substances Control Act). Similarly, the Fifth Circuit found a parish ordinance which ostensibly regulated "commercial solvent cleaning" businesses to be a sham as the ordinance replaced a short-lived pri-

**23.** This excludes the kilns located at North Texas Cement and TXI in Midlothian, Texas, which were grandfathered under S.B. 1099 because they were burning hazardous waste prior to its effective date.

**24.** Mr. Warren was unable to determine if a roadside park within one-half mile of one kiln was or was not a "dedicated public park," which is a S.B. 1099 structure.

**25.** Many of New Braunfel's citizens have been quite vocal in their crusade to prevent Lafarge from burning HWDF at its Balcones Plant. In a November 1, 1990 TACB press release discussing potential "measures to address concerns relating to the operation of cement kilns," TACB Executive Director Steve Spaw is quoted as saying

> [s]uch measures are needed because there has been increasing interest by the cement industry in burning hazardous wastes in the kilns, which has triggered substantial citizen concern, such as expressed by Securing a Future Environment (SAFE) of New Braunfels.

*Plaintiff's Exhibit* # 10. Spaw also stated in the press release that

> [w]e would also want to provide an opportunity to factor any legislative decision into the

eventual review of *Lafarge's permit application* or any other comparable situations.

*Id.* (emphasis added). In her letter to the TACB requesting the moratorium on all permitting activities for commercial industrial waste incinerators, "such as cement kilns," Governor Ann Richards refers to recently proposed new commercial incinerators being "strenuously opposed by citizen groups and local officials." One of the citizen groups referred to by Governor Richards was obviously SAFE as Senator Judith Zaffirini stated to Governor Richards, during the March 20, 1991 public hearing before the Senate Committee on Natural Resources, that she wanted

> to point out for the record because there are so many people who are here ... from New Braunfels ... who want to acknowledge that you were one of the first candidates for state-wide office who signed their petition opposing the burning of hazardous wastes in cement kilns.

*Members of the group SAFE also moved to intervene in this case two days after it was filed and have bombarded the Court with letters, which the Court has not read but assumes request a ruling against Lafarge.*

or ordinance banning outright the disposal of polychlorinated biphenyls ("PCBS") and as the ordinance would still have the practical effect of banning all disposal of PCBs in the parish. *Rollins Environmental Serv., Inc. v. Parish of St. James,* 775 F.2d 627, 630–31, 636–37 (5th Cir.1985). Thus, the Court held the ordinance preempted by the Toxic Substances Control Act, which explicitly preempts state and local regulation of PCB disposal. *Id.* at 634, 638.

More recently a district court in Oklahoma upheld a siting prohibition very similar to the one challenged in this case. *See Blue Circle Cement, Inc. v. Bd. of County Comm'rs* No. 91–C–635–E, (N.D.Okla. Aug. 5, 1992). In *Blue Circle* a cement manufacturer challenged a county ordinance prohibiting the location of industrial disposal sites within one mile of a "platted residential subdivision" and which had recently been amended to include cement kilns which burn HWDF. *Id.* slip op. at 2. Distinguishing the case from *Ensco, Inc. v. Dumas* and citing the savings clause of RCRA, the Court noted that the ordinance did not prohibit disposal of hazardous waste, but rather was a "permissible 'good faith adaptation of federal policy to local conditions.' " *Id.* at 7 (quoting *Ensco,* 807 F.2d at 745). Thus, the ordinance was not preempted by RCRA. *Id.*

Lafarge argues that *Blue Circle* is distinguishable because the plaintiff in that case argued for preemption under RCRA alone and not under the BIF rules as well. This Court finds that argument unpersuasive as the reasoning of *Blue Circle* and the previously cited cases applies even when one considers the effect of the BIF rules. While the decision of a district court in a foreign circuit is certainly not binding on this Court, *Blue Circle* is yet another example of the prevailing view that a complete prohibition is required for preemption to exist.

Lafarge also argues that S.B. 1099's siting prohibition is impermissibly "based on generalized environmental or health and safety concerns" as was the city ordinance in *Ogden Environmental Services v. City of San Diego,* 687 F.Supp. 1436 (S.D.Cal. 1988). *See Plaintiff's Citation of Authorities,* at 7 (Sept. 3, 1992). However, the ordinance in *Ogden* was quite different. After the EPA issued to Ogden Environmental Services a preliminary draft research, development and demonstration permit and concluded that the permit ensured adequate protection of human health and the environment, and after the California Department of Health Services and other local agencies issued similar permits, San Diego enacted an "emergency" ordinance requiring a conditional use permit for hazardous waste facilities seeking research, development and demonstration permits. *Ogden,* 687 F.Supp. at 1438–39. As may be argued in this case, Ogden was clearly the target of the emergency ordinance. *See id.* at 1440. However, unlike in this case, not only had Ogden's operations already been approved and found safe by federal, state, and local agencies, but the ordinance contained no standards for the City Council to use in determining whether to grant the permit or not. *See id.* at 1446. Thus, the City had unfettered discretion, allowing it to effect a complete ban by way of a subterfuge similar to that in *Rollins* and in violation of *Ensco,* and, therefore, the ordinance was preempted. *Id.*

That simply is not true in the case before this Court. S.B. 1099's siting prohibition leaves no room for discretion or guesswork. There either exists an S.B. 1099 structure within one-half mile of a new or expanding commercial hazardous waste management facility or not. In addition, although perhaps not articulated in the statute or legislative history, the purposes enumerated by witnesses for the State—to protect in case of upsets, spills, or other unusual events—are rational and certainly within the purview of the legislature's authority to regulate hazardous waste management as anticipated by Congress. *See* 42 U.S.C. § 6929. The fact that S.B. 1099 appears to have been passed with Lafarge's Balcones Plant expressly in mind makes the law somewhat repugnant in the view of this Court, but it does not cause the law to be unconstitutional. *See* Note 24, *supra.*

The EPA's definition of "inconsistent", used when examining a state's RCRA program for any inconsistent aspects which would necessitate not granting, or withdrawing, the state's authorization to administer the program, also supports this Court's conclusion that the siting prohibition is not preempted due to an actual conflict with federal law. According to EPA regulations:

> (b) Any aspect of State law or of the State program which has *no* basis in human health or environmental protection *and* which acts as a *prohibition* on the treatment, storage or disposal of hazardous waste *in the State may* be deemed inconsistent.[26]

40 C.F.R. § 271.4, *quoted in Hazardous Waste Treatment Council v. Reilly*, 938 F.2d 1390, 1392–93 (D.C.Cir.1991). Thus, under the EPA's own regulation, a siting prohibition such as that found in S.B. 1099 would not be "inconsistent" with federal law because it does not act as a complete prohibition on burning of HWDF in cement kilns in Texas and it has some basis in human health. *Accord Reilly*, 938 F.2d at 1395 ("We ... construe the EPA's decision to mean that a state law 'acts as a prohibition' on the treatment of hazardous wastes when it effects a total ban on a particular waste treatment technology within a State, and nothing more").

Although Texas has not yet received authorization to administer a state program with respect to the BIF rules, preliminary review of S.B. 1099 by the EPA indicates that the EPA is also likely to find S.B. 1099 consistent with federal law. *See Defendant's Exhibits,* #2 and #6. For instance, EPA Assistant Administrator Don Clay wrote to EPA Regional Administrator Robert Layton, Jr. concerning potential consistency problems with S.B. 1099: "[W]e do not believe that the proposed legislation on its face violates the RCRA consistency criteria." *Defendant's Exhibit* #6. Similarly, in a memorandum from

EPA Assistant Regional Counsel Olga Moya to the chiefs of EPA's RCRA Programs Branch and RCRA Permits Branch, Ms. Moya stated: "There are no provisions in this version of the bill [S.B. 1099] that would jeopardize the authorized program."[27] *Defendant's Exhibit* #2.

For the reasons stated above, the Court finds that the siting prohibition of S.B. 1099, as applied to Lafarge, is not preempted by RCRA or the BIF rules.

## VI. *Commerce Clause*

■ Lafarge bases its second attack on S.B. 1099's siting prohibition on the Commerce Clause of the United States Constitution. The test for determining a statute's validity under the Commerce Clause has been stated by the Supreme Court as follows:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Lafarge's first argument, that the siting prohibition does not regulate "evenhandedly" because it effects only commercial and not noncommercial facilities, is premised on a blatant misreading of the standard. The relevant inquiry is whether or not the statute applies evenhandedly to in-state and out-of-state companies, which it clearly does. *See Old Bridge Chemicals, Inc. v. New Jersey Dep't of Envtl. Protection,* 965 F.2d 1287, 1291–93 (3d Cir. 1992), *cert. denied* — U.S. —, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992); *Nat'l Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management,* 910 F.2d 713, 720–21 (11th Cir.1990); *Blue Circle,* slip op. at 8.

---

26. Subsection (a) addresses Commerce Clause concerns.

27. Should the EPA ultimately conclude that the siting provision of S.B. 1099 is not inconsistent with RCRA or the BIF rules, that decision will,

according to the Supreme Court, carry great weight in any subsequent suit challenging S.B. 1099 under the Supremacy Clause. *See Hillsborough,* 471 U.S. at 721, 105 S.Ct. at 2379.

■ Since the siting prohibition does apply evenhandedly and has only an incidental impact on interstate commerce, the relevant inquiry is whether or not it effects a legitimate public interest, and, if so, whether any burden on interstate commerce is *"clearly excessive* in relation to the putative local benefits." *See Pike,* 397 U.S. at 142, 90 S.Ct. at 847 (emphasis added). As this Court has already found a legitimate public interest exists, the only remaining issue is the extent of the burden on interstate commerce as compared to the benefit of a half-mile buffer zone in case of spills, upsets, or other unusual events.

Lafarge's primary arguments that the siting prohibition unreasonably burdens interstate commerce appear to be twofold: (1) approximately 80% [28] of cement and lime kilns in Texas will not be allowed to burn HWDF; and (2) if Lafarge cannot burn HWDF because of S.B. 1099's siting prohibition, much hazardous waste generated in Texas will be disposed of outside of Texas and much hazardous waste generated in Mexico and the Gulf Coast region will not be imported into Texas when it would otherwise have been sent to the Balcones Plant for disposal.

Both Lafarge and the State placed a great deal of emphasis on the TWC's 1992 Needs Assessment, which predicted that Texas would have adequate capacity to dispose of hazardous liquid waste in incinerators and cement kilns in 1995. Lafarge argues that the Needs Assessment overestimates the capacity of incinerators and cement kilns to meet the 1995 demand because the Assessment includes the projected capacity of cement kilns which were applying for, and have since been denied, interim status to burn HWDF.[29] However, the Needs Assessment explicitly states on page iii that only the capacity of waste management units that are permitted or authorized to operate under interim status

were included in the Assessment. Susan Ferguson, Director of the Industrial and Hazardous Waste Division also testified to this effect, stating that the anticipated capacity of Lafarge and other cement kilns which had not yet been granted interim status was not included in the assessment. Thus, to the extent that the Needs Assessment is otherwise accurate, Texas does have sufficient capacity to manage liquid hazardous waste regardless of the effect of S.B. 1099.

Lafarge also argues that even if Texas has sufficient capacity to dispose of liquid hazardous waste, the siting prohibition, as applied to its Balcones Plant, will nonetheless cause a great exodus of liquid hazardous wastes to neighboring states and prevent importation of such wastes from maquiladoras on the Mexican/United States border and neighboring states. This may be true given the significant price differential between the cost of burning hazardous waste at incinerators (approximately $1.50/gallon) and cement kilns (approximately $0.28/gallon); however, such market decisions are already being made by generators of hazardous waste. *See e.g., Defendant's Exhibit* # 1 (Feb. 28, 1992 *Needs Assessment for Hazardous Waste Commercial Management Capacity in Texas*), at II–3 (in 1989 423,200 tons of hazardous waste generated in Texas were shipped to in-state facilities and 345,600 tons were sent to out-of-state facilities). A potential increase in that market trend due to the denial of a permit to burn HWDF to one cement kiln in Texas is not an excessive burden, especially given the purpose of the siting prohibition to protect human health and safety.

There are still four or five existing cement kilns which would not be prohibited from receiving a permit to burn HWDF under S.B. 1099, and there are still areas in

28. Recall Mr. Warren's testimony that of 24 existing cement and lime kilns in Texas, 19 (79%) or 20 (83%) would be barred from burning HWDF due to the presence of an S.B. 1099 structure within one-half mile of the kiln.

29. Apparently the EPA also made this false assumption as indicated by the March 18, 1992

letter from EPA Regional Administrator B.J. Wynne to Chairman of the TWC John Hall, which states that the denial of "RCRA interim status to four Texas cement kilns.... will reduce the available incineration-liquids/cement kiln capacity by 245,000 tons." *See Plaintiff's Exhibit,* # 23.

Texas where new cement kilns could be built without violating S.B. 1099's siting prohibition. Finally, Lafarge may attempt to buy the established residences located within one-half mile of its Balcones Plant. While the price, if any of the owners would agree to sell at all, may be high, that may simply be a cost of doing business Lafarge must incur. The siting prohibition of S.B. 1099 does not violate the Commerce Clause.

## VII. *Equal Protection*

■ Lafarge's final constitutional attack on S.B. 1099's siting prohibition, based on the Equal Protection Clause of the United States Constitution, also fails. Commercial hazardous waste management facilities certainly do not fall under the traditional labels of "suspect" or even "quasi-suspect" classes which are entitled to heightened scrutiny under the Equal Protection Clause. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440–42, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985). Thus, the correct inquiry is whether or not the distinction between commercial and noncommercial facilities in S.B. 1099 is rationally related to any legitimate interest of the State. *See id.*

The State has easily met that burden. According to the State, the variety of hazardous waste categories burned by commercial facilities is often greater and less predictable than in the case of noncommercial facilities which accept only waste from the company's plants. In addition, if a hazardous waste site is abandoned and cleanup under CERCLA (the Comprehensive Environmental Response, Compensation, and Liability Act of 1980) required, more "players" will be involved at a commercial facility as many generators may send their waste to a commercial facility and each generator is a "potentially responsible party" for the cost of cleanup. Most

convincing to this Court was the State's evidence that approximately ten to twenty percent of spills in Texas are caused by commercial hazardous waste management facilities, while commercial facilities comprise only one percent of all hazardous waste management facilities. The siting prohibition of S.B. 1099 is clearly rationally related to the legitimate state interest of protecting human health and safety.

## VIII. *Conclusion*

The siting prohibition of S.B. 1099 violates no provision of the U.S. Constitution. Despite the fact that Congress clearly intended to encourage recycling of hazardous waste and energy recovery by methods like burning hazardous waste derived fuels at cement kilns, the siting prohibition does not prohibit all cement kilns in Texas from burning HWDF and does not unreasonably interfere with the interstate commerce. In addition, the fact that the Texas legislature obviously had Lafarge specifically in mind when it passed S.B. 1099 does not in of itself make the statute unconstitutional. Moreover, this Court's opinion that the siting prohibition is not the best way to ensure the safety of persons living near to HWDF burning facilities and promote Congressional goals is also irrelevant as it is not the role of the courts to judge the wisdom of constitutionally valid statutes.[30] Therefore, the Court enters the following orders:

IT IS ORDERED that Defendant Garza's Motion to Dismiss for Failure to State a Claim is DENIED.

IT IS FURTHER ORDERED that Lafarge Corporation's request for injunctive relief and a declaratory judgment is DENIED and that Lafarge Corporation take nothing in its cause against William R. Campbell, Executive Director of the Texas

---

**30.** One of Lafarge's most persuasive argument against the siting prohibition was the fact that five out of six HWDF-burning cement kilns with which Systech is affiliated would be prohibited from burning hazardous wastes under S.B. 1099. Thus, if applied nationwide, the siting prohibition would certainly reduce significantly the amount of hazardous waste being burned as fuel, which Congress and the EPA obviously intended to encourage as a safe and resourceful means of disposing of hazardous waste and conserving energy. The Court was very impressed with those statistics as well as the abundant evidence indicating that Lafarge and Systech's operations are well run and equipped with extensive state-of-the-art safety controls such as storing HWDF in a tank within a tank within a concrete box with a foam fire suppression system in the event any of the HWDF manages to escape.

Air Control Board, or Jesus Garza, Executive Director of the Texas Water Commission.

Judgment will be entered accordingly.