TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00219-CV







Secured Environmental Management, Inc., Appellant


v.


Texas Natural Resource Conservation Commission, Jeffrey Saitas, and 

The City of Mont Belvieu, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. GN102659, HONORABLE PAUL DAVIS, JUDGE PRESIDING




 In this case, we determine whether a Texas statute, section 361.114 of the Health and
Safety Code, which bans hazardous waste disposal in salt-dome formations, is preempted by the
Federal Resource Conservation and Recovery Act ("RCRA"). See Tex. Health & Safety Code Ann.
§ 361.114 (West Supp. 2003); 42 U.S.C.A. §§ 6901-6991 (West 1995 & Supp. 2003). Before the
Texas statute was passed, Secured Environmental Management ("SEM") had applied for a permit
to dispose of hazardous waste in a salt-dome formation. After passage of the statute, the Texas
Natural Resource Conservation Commission (1) (the "Commission") informed SEM that it would no
longer consider the aspects of SEM's application dealing with hazardous waste disposal in salt
domes and requested that SEM revise its application to omit any mention of salt-dome hazardous
waste disposal. In response to the Commission's request, SEM sought a declaratory judgment that
section 361.114 was preempted by federal law and an injunction preventing the statute's
implementation. The trial court held that 361.114 is not preempted. We agree with the trial court
and will affirm.


BACKGROUND

 In 1992, SEM applied to the Commission for a permit allowing a comprehensive
waste disposal scheme, part of which involved a plan to store non-liquid hazardous waste in salt-dome formations. At that time, Texas provided by statute that certain regulatory requirements had
to be met before hazardous waste could be deposited in salt domes. Among other things, a license
applicant had to demonstrate that: (1) there existed an urgent public necessity; (2) salt-dome
disposal was at least as safe as alternative disposal methods; and (3) the project would protect
groundwater and public water supplies. Act of June 7, 1991, 72d Leg., R.S., ch. 296, § 1.20, 1991
Tex. Gen. Laws 1251 (amended 2001) (current version at Tex. Health & Safety Code Ann. § 361.114
(West Supp. 2003)). In addition, under the Commission's then-current rules, SEM would have had
to explain the appropriateness of disposing of the particular type of waste in a given salt dome,
taking into account the unique geology of that salt dome. See Tex. Admin. Code §§ 331.121(a), (d),
(g) (2002) (superseded by statute, Act effective Sept. 1, 2002, 77th Leg., R.S., ch. 965, § 9.02, 2001
Tex. Gen. Laws 1965) (codified at Tex. Health & Safety Code Ann. § 361.114 (West Supp. 2003)). 
SEM faced a substantial statutory and regulatory hurdle in obtaining its permit.

 The federal government has also placed substantial limitations on licenses for salt-dome hazardous waste disposal. RCRA, the federal omnibus statute regarding hazardous waste
disposal, provides strict limitations on the licensing of salt domes for hazardous waste disposal. 
RCRA's provisions serve as minimum regulations; the states are generally empowered to adopt more
strict regulations regarding hazardous waste disposal. See 42 U.S.C.A. § 6929. 

 If approved, SEM's program would have been the first use of salt-dome caverns to
store hazardous waste in Texas. Salt-dome formations are mounds or plugs of salt buried in the
earth's upper strata. They occur in areas where the soil is relatively porous and prone to groundwater
contamination; sometimes they contain natural deposits of oil and natural gas. One method for
exploiting salt domes for industrial use is "solution mining." A borehole is drilled deep into the salt,
and water is pumped in to dissolve a portion of the salt. When the solution is extracted, a cavern
remains inside the salt deposit. This method is traditionally used for storing reserves of natural gas
and oil. Experience with the storage of fossil fuels suggests that such solution-mined caverns are
not stable. They tend gradually to close because the salt itself tends to move. This movement can
cause the cavern walls to crack, allowing whatever is contained inside to leach out into the
surrounding area. Because of this danger, both the federal and state governments have created
statutes carefully limiting any proposed use of solution-mined salt-dome caverns to dispose of
hazardous wastes. 

 This Court has twice decided cases dealing with applications for this type of disposal
program. Hunter Indus. Facilities v. Texas Nat. Res. Conservation Comm'n, 910 S.W.2d 96 (Tex.
App.--Austin 1995, writ denied) (upholding Commission's rejection of applications to dispose of
non-liquid hazardous waste in solution-mined salt domes); United Res. Recovery v. Texas Water
Comm'n, 815 S.W.2d 797 (Tex. App.--Austin 1991, pet. denied) (upholding Commission's
rejection of plan to dispose of semi-solid hazardous waste in salt domes). The potential dangers
involved in salt-dome disposal are considerable; only strict enforcement of federal and state waste-disposal systems can adequately protect the public health. See Hunter, 910 S.W.2d at 101; United
Res., 815 S.W.2d at 804 (holding that Water Commission could require stronger showing of salt
dome's structural integrity than required by federal guidelines).

 In 1999, the Texas Legislature banned the disposal of hazardous waste, solid or
liquid, in solution-mined salt domes or sulphur mines. (2) Accordingly, the Commission issued a letter
to SEM indicating that it was no longer possible to grant a permit for salt-dome hazardous waste
disposal. The Commission requested that SEM revise its application to remove any plans to dispose
of hazardous waste in salt domes. SEM chose not to amend its applications; instead, SEM brought
this declaratory judgment action against the Commission to establish that the Texas statute was
preempted by the applicable federal statute, RCRA. 

 SEM moved for summary judgment, contending that section 361.114 is preempted
because it conflicts with RCRA's stated object and purpose. The Commission and the City of Mont
Belvieu (3) both filed cross-motions for summary judgment against SEM on the ground that section
361.114 did not conflict with the object and purpose of RCRA. The trial court granted the
Commission's motion, held that its action on the Commission's motion impliedly disposed of any
issues raised in Mont Belvieu's motion, and denied SEM's motion. SEM now appeals, arguing that
the statute is, as a matter of law, preempted by federal law.

 SEM argues that section 361.114 is preempted because, by specifically addressing
salt domes in RCRA, Congress has mandated that they remain a potential means of disposing of
hazardous waste in any waste disposal regime promulgated by the federal Environmental Protection
Agency or an authorized state such as Texas. The Commission responds that, in accordance with
RCRA's allocation of power between state and federal government, Texas has only enacted a more
stringent requirement under its general power to regulate hazardous waste placed into landfills. We
agree with the Commission.


DISCUSSION

The Resource Conservation and Recovery Act

 In 1976, responding to growing concern about the disposal of solid and hazardous
waste, Congress passed RCRA, which exhorted the Environmental Protection Agency ("EPA") to
create national standards for the storage and disposal of hazardous waste materials. 

 RCRA creates "a viable Federal-State partnership" to carry out its purposes. 42
U.S.C.A. § 6902(a)(7) (West 1995). It does so principally through sections 6926 and 6929. Id.
§§ 6926, 6929 (West 1995). Section 6929, RCRA's savings provision, empowers states to adopt
regulations "more stringent" than their federal equivalents. Section 6926 allows the EPA to
"authorize" states to carry out their own hazardous waste programs "in lieu of" the federal program. 
An authorized state becomes the sole permitting authority for the storage, treatment, or disposal of
hazardous waste within that state. Id. § 6925(b). Texas is an "authorized state" under section 6926. 
40 C.F.R. § 272.2201 (2002). Thus, RCRA creates minimum standards below which the states may
not set their waste disposal criteria, provides for the states to adopt more stringent standards, and
allows some states, including Texas, to completely administer their own waste disposal programs.

 In 1986, concerned that the EPA and various states had moved too slowly in creating
workable waste disposal guidelines, Congress added a number of provisions creating standards to
deal with particular hazardous waste problems. See, e.g., 42 U.S.C.A. §§ 6924 (b)-(y) (West 1995
& Supp. 2003). These provisions identified certain materials and disposal methods as impermissible,
while imposing intermediate restrictions on certain other materials and disposal methods. For
example, RCRA provides that "land disposal . . . should be the least favored method for managing
hazardous wastes," as that method poses a "substantial risk to human health and the environment." 
Id. § 6901(b)(7) (West 1995). RCRA defines "land disposal" to include many different means for
burying or obscuring waste, including salt-dome formations. Id. § 6924(k). RCRA defines
hazardous waste as "a solid waste . . . which . . . may cause, or significantly contribute to an increase
in mortality or an increase in serious irreversible . . . illness or . . . pose a substantial present or
potential hazard to human health or the environment when improperly treated, stored . . . or
otherwise managed." Id. § 6903(5)(a)-(b) (West 1995). The EPA has the power, after a contested
public hearing, to place substances on the list of hazardous waste subject to RCRA's provisions. Id.
§ 6921(a). In addition, certain wastes are denominated hazardous wastes by specific statutory
provision. See, e.g., id. § 6921(e)(1) (declaring halogenated dioxins and halogenated dibenzofurans
to be hazardous waste). Thus, the provisions of RCRA governing "hazardous waste" provide that
any substance either specifically designated by Congress to be hazardous, or deemed by the EPA to
be hazardous, shall at least be disposed of under the minimum safety standards set out by RCRA.


The Texas Health and Safety Code, section 361.114

 Until the 2001 amendment, the Texas Health and Safety Code had provided extensive
statutory and regulatory requirements for permitting hazardous waste disposal in salt domes. These
included an affirmative showing of necessity and a demonstration that groundwater would not be
affected by any hazardous waste placed in a salt dome. (4) 

 The legislature has, however, superseded that detailed statutory provision with the
following:


 Sec. 361.114. PROHIBITION OF DISPOSAL OF HAZARDOUS WASTE
INTO CERTAIN GEOLOGICAL FORMATIONS.


 The commission by rule shall prohibit the storage, processing, or disposal of
hazardous waste in a solution-mined salt dome cavern or a sulphur mine 



Act effective Sept. 1, 2002, 77th Leg., R.S., ch. 965, § 9.02, 2001 Tex. Gen. Laws 1965 (codified
at Tex. Health & Safety Code Ann. § 361.114 (West Supp. 2003)) (emphasis added). Thus, the
legislative amendment creates an outright ban on disposing of hazardous waste in solution-mined
salt domes. The Health and Safety Code defines "hazardous waste" to include the same substances
included in RCRA's omnibus list of dangerous substances. Id. § 361.003(12) (West 1995). Both
the Health and Safety Code and RCRA, by definition, regulate disposal of the same substances. The
only difference material to this case is in the specific provisions regarding salt-dome waste disposal.


Preemption Analysis

 Because this suit was bought for declaratory judgment based only on the letter issued
by the Commission, we have no administrative record nor any information specific to SEM's
particular application. Rather, SEM argues that the Texas statute is preempted as a pure question
of law, based on the text of the federal and Texas statutes involved. Therefore, we must determine
whether, under RCRA's specific provisions and general preemption analysis, Texas's statutory
restriction on solid hazardous waste disposal is preempted by RCRA. 

 The laws of the United States are the "supreme Law of the Land . . . any Thing in the
Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. If a
state law conflicts with federal law properly enacted by the Congress within its constitutional
authority, the state law is preempted and has no effect. Maryland v. Louisiana, 451 U.S. 725, 746
(1981). In order to preserve the states' dignity and autonomy, however, the courts have usually
presumed that state laws will not be preempted in areas over which the states have traditionally
exercised their independent authority. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 229-30
(1947). When Congress clearly manifests its intent to preempt state regulation, however, the
supremacy clause grants it that power. See, e.g., Boggs v. Boggs, 520 U.S. 833, 844 (1997).

 The party asserting federal preemption bears the burden of proof. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255 (1984); Boon Ins. Agency, Inc. v. American Airlines, Inc., 17
S.W.3d 52, 55 (Tex. App.--Austin 2000, pet. denied), cert. denied, 531 U.S. 1113 (2001). 
Preemption can be demonstrated either explicitly or implicitly. Congress may expressly preempt
state law in its enactments. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992). A federal
statute may impliedly preempt state law if Congress states an intent to occupy the field of regulation
in a particular area, or if a state law actually conflicts with federal law or regulations. Freightliner
Corp. v. Myrick, 514 U.S. 280, 287 (1995). A state law may be said to conflict with federal law in
two situations: (1) when state law "stands as an obstacle to the accomplishment and execution of the
full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67 (1941), and (2)
when "compliance with both federal and state regulations is a physical impossibility," Florida Lime
& Avocado Growers v. Paul, 373 U.S. 132, 142-43 (1963). 

 Federal statutes do not always preempt every aspect of regulation over a particular
subject-matter. Many, including RCRA, have "savings clauses" that, instead of preempting state law
outright, reserve to the states some specified degree of authority. E.g., 42 U.S.C.A. § 6929. Any
state action that is not within the scope of the clause is expressly preempted. However, even when
a federal statute's preemption clause does not clearly bar a state law, or the state law might be
considered to be within the statute's savings clause, ordinary principles of implied preemption may
still apply. Geier v. American Honda Motor Co., 529 U.S. 861, 873-74 (2000). Although the overall
goals of the state and federal law are the same, state law may be preempted in these situations "if it
interferes with the methods by which the federal statute was designed to reach [its] goal." 
International Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987). When assessing the implied
preemptive effect of a federal statute on a state statute, we must ask whether the statute is consistent
both with the federal statute's structure and purpose, taken as a whole, and its objectives and
policies. Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 89 (1992). We are to look not
so much to the legislature's professed purpose in passing the statute, but at the "effects of the law." 
Id. at 90. A state statute will not be saved from preemption merely because it has some effect
outside the scope of the federal statute. Id. Thus, in this case, we will consider whether "the
practical impact" of section 361.114 interferes with the goals and methods of RCRA. See Hughes
v. Oklahoma, 441 U.S. 322, 336 (1979) (citing Lacoste v. Department of La. Conservation, 263 U.S.
545, 550 (1924)). 

 Whether RCRA preempts a particular state hazardous waste statute, then, depends
on whether there exists an actual conflict between federal policy and local regulatory decisions. 
Some cases might require fact finding on the scope and effect of the state and federal regulations. 
See Blue Circle Cement, Inc. v. Board of County Comm'rs, 27 F.3d 1499, 1508-09 (10th Cir. 1994)
(RCRA preemption question depends on whether, under Gade, there is a practical conflict between
federal and local policy). The parties have stipulated that this would be the first time that salt-dome
hazardous waste disposal has been attempted in the United States; there is no germane federal or
state waste disposal program actually in existence. We have only RCRA's statutory language on
which to base our determination. SEM takes the position that, read in light of RCRA's congressional
findings, the specific language of section 6924(b), which establishes special rules regarding
hazardous waste disposal in salt domes, evinces an affirmative Congressional policy that salt-dome
disposal remain a potential means for disposing of solid hazardous waste. Therefore, according to
SEM, section 361.114 is preempted because it conflicts with RCRA's object and purposes. 

 RCRA prohibits dumping and open waste-disposal sites, 42 U.S.C.A. § 6902(a)(3)-(7), but still allows for hazardous waste "treatment, storage, and disposal." See id. §§ 6903(3), (33),
(34) (emphasis added). SEM considers this language to constitute the underlying policy of RCRA:
to create a national waste disposal policy which includes salt-dome hazardous waste disposal. 
Because RCRA limits, rather than bans, land disposal, SEM takes the position that Congress created
a requirement that land disposal be an element of any waste-disposal program under the authority
of the EPA or the authorized states. 

 Following the 1984 amendments, RCRA has included a distinct subsection addressing salt-dome disposal for liquid and solid hazardous waste. 



 Salt dome formations, salt bed formations, underground mines, and caves




 Effective on November 8, 1984, the placement of any noncontainerized or
bulk liquid hazardous waste in any salt dome formation, salt bed formation,
underground mine, or cave is prohibited until such time as




 
 
 the Administrator has determined, after notice and opportunity for
hearings on the record in the affected areas, that such placement is
protective of human health and the environment,

 
 the Administrator has promulgated performance and permitting
standards for such facilities under this subchapter, and;

 a permit has been issued under section 6925(c) of this title for the
facility concerned.
 




 Effective on November 8, 1984, the placement of any hazardous waste
other than a hazardous waste referred to in paragraph (1) in a salt dome
formation, salt bed formation, underground mine, or cave is prohibited until
such time as a permit has been issued under section 6925(c) of this title for
the facility concerned.

 No determination made by the Administrator under subsection (d), (e), or
(g) of this section regarding any hazardous waste to which such subsection
(d), (e), or (g) of this section applies shall affect the prohibition contained
in paragraph (1) or (2) of this subsection.

 Nothing in this subsection shall apply to the Department of Energy Waste
Isolation Pilot Project in New Mexico.




42 U.S.C.A. § 6924(b). Liquid hazardous waste may not be disposed of in a salt dome under any
circumstances until the EPA or the state has established that, in general, it can be disposed of safely. 
See Natural Res. Def. Council, Inc. v. United States Envtl. Prot. Agency, 907 F.2d 1146, 1164-65
(D.C. Cir. 1990) (rejecting EPA rule that would have issued salt-dome liquid-waste permits on case-by-case basis). By contrast, non-liquid waste is subject to the permitting and policy decisions of
either the EPA or the authorized state. 42 U.S.C.A. § 6924(b). Section 6924(b)(1) prohibits disposal
of liquid hazardous waste in salt domes until such time as the licensing authority shall have adopted
general rules and standards ensuring acceptable safety. Section 6924(b)(2) states that any hazardous
waste not covered by paragraph one is "prohibited until such time as a permit has been issued under
section 6925(c)." 

 SEM reads this statutory language to say that, because section 6924(b)(2) does not
absolutely prohibit salt-dome disposal for solid hazardous waste, RCRA comprises an affirmative
Congressional mandate that such disposal has been expressly selected as a potentially safe means
of waste disposal. Therefore, SEM concludes, Texas's section 361.114 conflicts with the object and
purpose of RCRA because the Legislature has enacted an outright ban on a disposal method
permitted by RCRA. We disagree.

 The Texas Health and Safety Code adopts RCRA's definition of hazardous waste. 
Tex. Health & Safety Code Ann. § 361.003(12) (West 2001) (defining hazardous waste as solid
waste identified or listed as hazardous waste by EPA under RCRA's provisions). Section 361.114,
then, bans hazardous waste disposal in "a solution-mined salt dome cavern or a sulphur mine." Id.
§ 361.114. This statute must be read in context with three applicable sections of RCRA defining the
scope of RCRA's disposal policy regarding salt domes: 6925(c), under which the proper authority
may issue disposal-site permits; 6925(k), which states that land disposal, including among other
things salt-dome disposal, should only be permitted when there is a factual finding of safety to
human health and the environment; and 6924(b), which indicates that states may issue permits for
disposal of hazardous waste in "any salt dome formation, salt bed formation, underground mine, or
cave" only if it finds that such disposal protects human health and the environment as required by
section 6925(c). 42 U.S.C.A. §§ 6924(b), (k), 6925(c).

 Further, the applicable sections of RCRA create an outright ban on disposal of liquid
hazardous waste in a set of geologic formations including salt domes, id. § 6924(b)(1), and a
corresponding disapproval of solid-waste disposal in the same formations. Id. § 6924(b)(2). This
is as specific an articulation of federal policy regarding salt-dome disposal as we have been able to
glean from RCRA's plain language. We agree with SEM that RCRA seems to envisage the
possibility that it might be safe at some point in time to permit the use of some of the underground
geologic formations referenced in section 6924 to dispose of some hazardous waste. However,
section 6929 explicitly reserves to the states the opportunity to enact more stringent standards. The
Texas Legislature has made a decision to ban hazardous waste disposal in two of the geologic
formations listed in section 6924. It has, furthermore, focused specifically on formations created
through solution mining. (5) We construe this to be a precise, nuanced extension of RCRA's outright
ban on liquid hazardous waste, taken together with the regulatory oversight ceded to the states by
Congress.

 SEM draws our attention to a line of cases it claims stands for the proposition that
any ban on a particular means of hazardous waste disposal violates the object and purpose of RCRA
and is, therefore, preempted. These decisions have voided local government decisions that
contravened actual federal programs and waste disposal decisions. See, e.g., Rollins Envtl. Servs.
Inc., v. Parish of St. James, 775 F.2d 627, 634 (5th Cir. 1991) (parish ordinance purporting to ban
disposal of "commercial solvents" preempted by EPA determination that PCBs could be disposed
of safely); ENSCO, Inc. v. Dumas, 807 F.2d 743, 745 (8th Cir. 1986) (county ordinance banning
disposal of "acute hazardous waste" despite EPA policy allowing hazardous waste disposal); Ogden
Envtl. Servs. v. City of San Diego, 687 F. Supp. 1436, 1448 (S.D. Cal. 1988) (denial of city permit
for waste combustion facility preempted by EPA's determination that proposed incinerator was
sufficiently safe). The courts, using object-preemption analysis, held that even a local regulation that
was stricter than a federal standard might, in some cases, be preempted. E.g., ENSCO, 807 F.2d at
745; Rollins, 775 F.2d at 634. In these cases, however, there existed a real danger that, by excluding
waste from their territories, local governments would be able to avoid their responsibility for
disposing of toxic waste generally. See, e.g., Warren County v. North Carolina, 528 F. Supp. 276,
289 (E.D.N.C. 1981). Thus, under SEM's authorities, RCRA may preempt state policies that are
more stringent than federal requirements, but only if there exists an affirmative federal order or
program. See Blue Circle Cement, 27 F.3d at 1508-09 (remanding for fact finding whether specific
state statute interfered with technical implementation of actual federal standards). These decisions
extend RCRA's preemptive scope in order to protect defined federal programs and policies
undertaken specifically to fulfill RCRA's ultimate intent and purpose.

 While we might in the abstract agree with the proposition that more stringent local
government regulation should not be allowed to impede federal waste disposal programs, this record
does not include even the outline of a federal program against which we might measure Texas's
narrow legislative enactment. Because we are not faced with the problem dealt with by SEM's line
of authorities, the question before us is whether Texas has acted within the power reserved to it
under section 6929. 

 Because we find no specifically articulated Congressional intent to require solid
hazardous waste disposal in salt domes, we must address the preemption question in terms of
RCRA's savings clause. Section 6929 reads that states and local governments "may not impose any
requirements less stringent" than those specifically provided for in RCRA, and at the same time state
governments retain express authority to create regulations "more stringent" than those specifically
provided in RCRA. 42 U.S.C.A. § 6929. Section 361.114, by placing a ban on certain means of
waste disposal, creates a more stringent waste disposal regulation than RCRA's and, therefore, falls
within section 6929's scope and is saved.

 While Texas's section 361.114 may stand in some tension with RCRA, we conclude,
as did the trial court, that they are not in conflict with one another. The Texas Legislature has simply
extended the scope of RCRA's ban on an experimental and untested waste-disposal procedure;
furthermore, the state ban reaches only underground areas cleared through solution-mining. If
Congress has the ability to regulate waste disposal by creating an outright ban on liquid hazardous
waste disposal in certain geologic formations, then Texas's power to enact more stringent
regulations, pursuant to the savings clause, must include the ability to extend that ban in order to
meet the same underlying policy concerns. We cannot, therefore, say that the Texas statute is in
conflict with RCRA's general policy of disfavoring ground disposal, read in light of its specific ban
on liquid hazardous waste disposal in salt domes and other geologic formations.

 It may be true, as SEM contends, that disposing of hazardous waste within the
confines of a salt dome is safer than committing it directly to the ground. SEM refers us to the
legislative history of the 1984 amendment in order to imply a purpose inherent in section 6924(b)
to ensure that salt-dome disposal is available. This does not dissuade us from our reading of the
statute's plain language. There is a presumption that Congress did not intend to preempt the state's
traditional regulatory activities. Geier, 529 U.S. at 948 n.22; Rice, 331 U.S. at 229-30. Applying
this presumption leads us to the conclusion that Texas is entitled to enact more stringent
requirements than those provided in RCRA, including creating a narrowly crafted ban on a
disapproved method of hazardous waste disposal.

 Both parties have drawn our attention to an analysis of whether certain waste-disposal
methods are "more favored" or "less favored" by RCRA. Although we concede that this may be an
important issue in determining whether a state law or regulation actually interferes with or defeats
an established federal waste disposal program, see Blue Circle Cement, 27 F.3d at 1508-09, it is not
determinative in our reading of the two statutes as they have been presented to us under the facts of
the case at bar.

 Moreover, Texas enjoys a special status under RCRA in that it is an "authorized
state," whose regulations may be adopted "in lieu" of the EPA's regulatory oversight. (6) 42 U.S.C.A.
§ 6296. A permit application under section 6925(c) addressed either to the EPA or an authorized
state agency is not a guarantee; it will only issue when an applicant overcomes the presumption that
land disposal should not be undertaken. Id. 6925(c). Section 6925(c) provides that permits will
contain "such terms and conditions as the Administrator (or the State) determines necessary to
protect human health and the environment." Id. This reinforces our conclusion: the actions of the
state of Texas, as an "authorized state," are not preempted by the same Congressional enactment
which expressly allowed for the creation of Texas as an authorized state. See Hazardous Waste
Treatment Council v. Reilly, 938 F.2d 1390, 1398 (D.C. Cir. 1991) (noting that section 6929
explicitly gives states great deal of autonomy limited primarily by technical determinations of EPA). 

 Section 361.114 falls squarely within the power granted by RCRA to the states: to
adopt more stringent requirements than those contained in RCRA itself or adopted by the EPA. Our
determination is based on the breadth of RCRA's actual language, not on any assessment of the
relative technical merits of different waste disposal methods. Accordingly, we overrule SEM's issue.

CONCLUSION

 Absent any mention in the record of a practical federal program aimed at disposing
of solid hazardous waste in salt domes, we hold that section 361.114 does not conflict with RCRA's
stated object and purpose. Because section 361.114 is a "more stringent" regulation, it falls within
RCRA's savings clause and is not preempted. Accordingly, we affirm the trial court's grant of
summary judgment.



 

 Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed: December 19, 2002

Publish
1. Effective September 1, 2002, the Texas Natural Resource Conservation Commission's
name was changed to the Texas Commission on Environmental Quality. See Act of June 15, 2001,
77th Leg., R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1985. Until January 1, 2004, the
Commission has the discretion to use either name as it phases in the new nomenclature. Because
the docketing statements name the TNRCC as a party, we will continue to use that designation.
2. Sulphur mines are cleared through a solution mining process similar to that used to clear
out salt-dome caverns for oil and natural gas storage. Only solution-mined salt domes are implicated
in this appeal.
3. The City of Mont Belvieu, which is situated near a large salt-dome formation heavily used
by the oil and gas industry, intervened in the declaratory judgment action. Because we do not
understand their legal position to be different from that taken by the Commission, we will deal with
both the City's and the Commission's arguments collectively. 
4. For a full discussion of the former statute, see Hunter Industrial Facilities v. Texas Natural
Resource Conservation Commission, 910 S.W.2d 96 (Tex. App.--Austin 1995, writ denied).
5. We note that in Europe salt domes that have been mechanically mined, rather than solution
mined, have been used for waste disposal. See Hunter, 910 S.W.2d at 100 n.5.
6. The parties have joined issue on the potential effect of any EPA action. However, in the
absence of any action by the EPA, this issue is not before us.