UNITED RESOURCE RECOVERY,
INC., Appellant,

v.

TEXAS WATER COMMISSION,
et al., Appellees.

No. 3–90–209–CV.

Court of Appeals of Texas,
Austin.

Aug. 14, 1991.

Rehearing Overruled Oct. 16, 1991.

Bruce Bigelow, Blazier, Rutland & Lerner, Austin, for appellant.

Jim Mattox, Atty. Gen., Celina Romero, Asst. Atty. Gen., Austin, for Texas Water Com'n.

Philip F. Patman, Patman and Patman, Austin, for James Sterling and Boling Production Co., Inc., intervenor/appellee.

J. Mark Lawless, Austin, for Wharton and Fort Bend Counties, Texas, and Concerned Citizens Against Pollution, intervenors/appellees.

Before CARROLL, C.J., and JONES and SMITH, JJ.

SMITH, Justice.

The Texas Water Commission ("the Commission") issued an order denying six applications for permits that would authorize United Resource Recovery, Inc. ("URR") to operate a hazardous waste disposal facility utilizing injection wells. URR sued the Commission in district court for judicial review of the order. The district court affirmed the order and URR has appealed to this Court. We will affirm the judgment.

## BACKGROUND

URR proposed to construct a hazardous waste disposal facility with two components: (1) a surface facility where liquid hazardous wastes would be blended with fly ash and a secret catalyst (F2S) to create a slurry; and (2) leached-out caverns in the Boling Salt Dome into which the hazardous waste slurry would be injected for storage.

In August 1983, URR filed six applications for the following permits: (1) a hazardous waste permit required to operate a surface facility pursuant to the Texas Solid Waste Disposal Act, Tex. Health & Safety Code Ann. §§ 361.001–361.345 (1990); (2) four injection well permits required for solution mining and hazardous waste injection pursuant to Tex. Water Code Ann. §§ 27.001–.105 (1988 & Supp.1991); and (3) one water quality discharge permit required for discharge into waters from a surface stormwater collection system and retention pond pursuant to the Tex. Water Code Ann. §§ 26.001–.407 (1988 & Supp. 1991). Because URR needed all six permits to operate the proposed waste disposal facility, the Commission consolidated the permit hearings. See 31 T.A.C. § 263.20 (1989). After holding an evidentiary hearing in 1986, the Commission approved the applications.

Several protestants sued in district court for judicial review of this decision. The district court purported to "dissolve" the Commission's order because it was not final; URR had failed to demonstrate the financial assurance required to secure its obligation to plug the wells and properly close the surface facility. See Browning–Ferris Inc. v. Brazoria County, 742 S.W.2d 43, 54 (Tex.App.1987, no writ). We interpret the district court's judgment as a dismissal for want of jurisdiction, owing to the court's conclusion that the Commission's order was not final. See Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19(a) (1991) ("APTRA").

When URR submitted financial assurance instruments in May 1988, the Commission approved the permit applications for the second time. The protestants again brought suit in district court. This time the district court reversed the order because the Commission had failed to reopen the evidentiary hearing to consider the adequacy of the financial assurance instruments and had failed to find that URR had made a satisfactory showing of financial assurance.

The applications were again before the Commission in 1989. Chairman Wynne, a Commission member who had not participated in earlier considerations of the applications, stated that he would consider the merits of the proposed waste disposal facility, as well as determining the adequacy of URR's financial assurance. Wynne also asked the public-interest advocate, as a party to the hearing, to prepare a report considering the need for, the viability of, and the benefit to be conferred on the public by the proposed operation.

The report of the public-interest advocate urged the Commission to deny the injection well permits because URR had failed to demonstrate that fresh groundwater would be protected from the pollution that could occur as a result of the hydrologic and structural instability of the Boling Salt Dome. The Commission held an evidentiary hearing and, in August 1989, issued an order denying all six permit applications

because URR had failed to show that groundwater would be protected by proper safeguards if the slurry were deposited in the proposed injection wells.

URR combines for argument its first two points of error complaining that the Commission acted in an arbitrary and capricious manner by failing to adopt sufficient underlying findings of fact to support the denial of the injection well permits, and by failing to make or adopt separate findings of fact to support the denial of the hazardous waste and water quality discharge permits. *See* APTRA § 19(e)(6). In its third point of error URR attacks the order as not supported by substantial evidence. *See Id.* § 19(e)(5). In points of error four and five URR complains that the Commission measured the permit applications against a new standard for solidification at the evidentiary hearing and failed to give proper notice that the new standard would replace the "paint-filter test." *See* APTRA § 19(e)(1)–(3). We now address appellant's first three points of error.

### FINDING OF FACT NO. 17

■ In response to URR's first point of error, we review the sufficiency of the Commission's findings under section 16(b) of APTRA. Section 16(b) requires the Commission to issue a final decision that includes separately stated findings of fact and conclusions of law. "Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." APTRA § 16(b). Proper underlying findings of fact should be "clear, specific, nonconclusory, and supportive of the ultimate statutory finding." *Texas Health Facilities Comm'n v. Charter Medical–Dallas*, 665 S.W.2d 446, 452 (Tex.1984). They should not be mere recitals of testimony or summations of the evidence. *Id.*

The Texas Water Code sets forth the statutory criteria the Commission must consider before it issues an injection well permit. The Commission must find that the applicant will use proper safeguards to adequately protect fresh ground and surface water from pollution. Tex. Water Code Ann. § 27.051(a)(3) (1988). The Commission addressed this requirement in finding of fact number 17 ("Finding No. 17"), an ultimate finding of fact set forth in statutory language:

Section 27.051(3) [sic § 27.051(a)(3) ] provides that the Commission may grant an application and issue a permit *if,* with proper safeguards, fresh groundwater can be protected. However, there is not a preponderance of evidence in the record that groundwater can be adequately protected.

Following the mandate in APTRA § 16(b), the Commission provided seventeen findings of underlying or basic fact to support this finding of ultimate fact.

To be precise, Finding No. 17 represents the Commission's *failure to find* that URR would adequately protect fresh groundwater. APTRA § 16(b) only requires the Commission to state those findings that support its ultimate findings; it is not required to state facts that it rejected in reaching its conclusion. *Pedernales Elec. Coop., Inc. v. Pub. Util. Comm'n*, 809 S.W.2d 332, 337 (Tex.App.1991, no writ). Nevertheless, we will address URR's contention that Finding No. 17 is not reasonably supported by sufficient underlying findings of fact.

■ There is no precise form in which an agency must articulate its underlying findings. *Goeke v. Houston Lighting & Power Co.*, 797 S.W.2d 12, 15 (Tex.1990). Moreover, the reviewing court may not subject the agency's order to some "hypertechnical standard of review." *Id.*, citing *State Banking Board v. Allied Bank Marble Falls*, 748 S.W.2d 447, 449 (Tex.1988). We require underlying findings of fact to ensure a serious appraisal of the facts by an agency. *Id.* at 452. Additionally, we must determine whether the underlying findings inform the parties and the courts of the basis for the Commission's decision so that the parties may intelligently prepare an appeal and the courts may properly exercise their review function. *Id.* at 449.

■ In sub-findings of fact 17(a)–(q), the Commission found that URR did not meet its burden of proving that:

* the secret mixing compound, F2S, would properly solidify the hazardous waste
* the slurry would effectively pour into the salt caverns and solidify after reaching the cavern bottom
* the slurry would maintain proper contact with the salt cavern walls to avoid disturbances affecting permeability.

The Commission further found that URR had not tested the mixture thoroughly enough to:

* predict long-term effects
* determine the amount of hazardous waste, if any, that would remain available to the environment
* demonstrate the use of kiln dust as an alternative to fly ash in the mixing procedure.

The Commission also found that persons with a financial interest in the operation conducted the scientific studies on the special catalyst's character and performance. This reflected the Commission's concern about the weight to be given to the testimony and conclusions of URR's expert witnesses. The Commission also found that fresh water existed in aquifers located above the proposed caverns. These aquifers would be at risk for pollution if the well-casings cracked or were severed during injection.

We conclude that the findings of basic fact supporting Finding No. 17 are clear and specific; they contain material facts related to the Commission's statutory duty to protect groundwater. The underlying findings reflect the Commission's concern about the experts' credibility, the inadequate testing of the slurry, and the integrity of the salt formation. Moreover, they specifically reflect the Commission's consideration of the facility's threat to nearby groundwater. We conclude that the underlying findings satisfy the requirements of APTRA § 16(b) and that, therefore, the Commission's actions were not arbitrary and capricious. We overrule the first point of error.

## SUBSTANTIAL EVIDENCE

■ In its third point of error, URR complains that the Commission's order is not supported by substantial evidence. APTRA § 19(e)(5). URR attacks only Finding No. 17. When conducting a substantial evidence review we must determine whether the record contains some reasonable basis for the Commission's action. *Charter Medical*, 665 S.W.2d at 452.

*Charter Medical* directs us to ask two questions in reviewing the substantial evidence: (1) Do the findings of underlying fact stated in the order fairly support the Commission's findings of ultimate fact or conclusions of law, stated as the basis of the agency decision; and (2) do the findings of underlying fact find reasonable support in the evidence adduced in the agency proceeding? If both answers are affirmative, we must uphold the Commission's order as supported by substantial evidence. *Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 813 (Tex.App.1988, writ denied).

■ The Commission phrased Finding No. 17 as an ultimate fact by stating the statutory criteria to protect groundwater. *See* Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases*, 16 Tex. Tech L.Rev. 475, 478 (1985). The Commission then based conclusions of law numbers three and four on Finding No. 17. The findings of basic fact explain that there was only speculative evidence of the effectiveness of the catalyst, F2S, and the rate at which the slurry would solidify. URR could not guarantee that the slurry would maintain proper contact with the cavern walls. The findings set forth that the salt dome was structurally unstable and that dynamite might be used to remove oil well casings in the salt dome. Additionally, two aquifers were located above the dome near the proposed site of the injection wells.

We conclude that the findings of basic fact Nos. 17(a)–(q) fairly support the Commission's ultimate finding that URR did not prove that it could adequately protect

groundwater if the injection well permits were issued. These findings also support Conclusion No. 3, which stated that URR's proposed methodology for solidification of the hazardous waste presented a threat to fresh groundwater and, Conclusion No. 4, which stated that the Commission should not issue the injection well permits. The order passes the first portion of the *Charter Medical* test.

The findings of basic fact which address the catalyst's ability to create a slurry, the problems related to pouring the slurry, the possible mounding of the slurry in the salt caverns, and the inadequate testing of the slurry, are all based on the testimony of the following witnesses: (1) L.T. Fan, a co-founder of the catalyst, F2S, and URR's expert in chemical engineering; (2) Robin Sommerville, a co-founder of F2S; (3) Larry Malone, URR's expert in hazardous waste management; and (4) Alice Hamilton Rogers, the Commission's enforcement coordinator. Four reports written by the Bureau of Economic Geology were introduced into the record; they support the findings related to the salt dome's instability. These findings are also supported by the testimony of Robert Thoms, a civil engineer testifying as URR's expert in the behavior of rock formations and salt properties. In addition, the Bureau reports support the findings that fresh groundwater is found adjacent to the proposed injection wells. Testimony from an oil and gas lease operator, a petroleum reservoir engineer and a Commission staff member supports the finding that the use of dynamite to sever oil and gas well casings posed a risk to the aquifer. Based on our review of the record, we conclude that the findings of basic fact have reasonable support in the evidence. Because we can answer both questions of the *Charter Medical* test affirmatively, we hold that substantial evidence supports the agency's order. We overrule the third point of error.

SEPARATE FINDINGS OF FACT FOR THE HAZARDOUS WASTE AND WATER QUALITY PERMIT APPLICATIONS

■ In its second point of error, URR complains that the Commission acted in an arbitrary and capricious manner because the findings of fact support denial only of the four injection well permits; the final order contains no separate findings of fact to support the denial of the hazardous waste permit or the water quality discharge permit. The Commission's order contained the following conclusions of law:

3. The application for injection of liquid wastes into salt caverns in the Boling Dome salt formation in Wharton County are inadequate in that the applicant's proposed methodology for solidification of wastes presents a threat to fresh groundwater.

4. In order to effectuate the policies of the State set forth in Chapters 26 and 27 of the Texas Water Code; Tex.Rev. Civ.Stat.Ann. art. 4477–7; the Texas Clean Air Act, Tex.Rev.Civ.Stat.Ann. art. 4477–5; and all applicable rules, regulations and orders of the Texas Water Commission and the Texas Air Control Board, and to administer all powers described therein, injection well Permits Nos. WDW–233–1, WDW–233–2, WDW–233–3 and WDW–233–4 should not be issued.

5. In light of Conclusion of Law No. 4, water quality discharge Permit No. 02784 should not be issued.

6. In light of Conclusion of Law No. 4, hazardous waste Permit No. HW–50135–001 should not be issued.

Because it denied the injection well permits, the Commission concluded that it should not issue the permits to operate a surface facility and to collect and store stormwater.

URR argues that the Commission acted arbitrarily when it denied the two other permits without separately listing underlying facts supporting that decision. We disagree. URR's failure to prove that it could protect groundwater resulted in the denial of the injection well permits. If it could not inject the slurry created by the surface waste facility into the salt caverns for storage, URR had no need for the other two permits. The injection wells were essential to URR's proposed waste facility. The

Commission's refusal to issue permits on a piecemeal basis was not arbitrary or capricious. Furthermore, a denial of the other two permits, on the basis indicated, could not have prejudiced URR's "substantial rights," as APTRA § 19(e) requires before arbitrary and capricious action may result in the reversal of an agency's final order.

■ Moreover, we have held previously that the version of the Solid Waste Disposal Act applicable here does not require the Commission to find any particular ultimate fact or consider any particular criterion before issuing a hazardous waste permit. Consequently, APTRA § 16(b), as construed by the Supreme Court in *Charter Medical,* does not require that the agency state the underlying facts upon which it reached its final decision. *County of Galveston v. Texas Dep't of Health,* 724 S.W.2d 115, 125–6 (Tex.App.1987, writ ref'd n.r.e.). Chapter 26 of the Texas Water Code requires the agency to consider past performance and compliance with existing permits and other matters not material here. Tex. Water Code Ann. § 26.0281, § 26.030 (1988). Under the holding in *Charter Medical,* APTRA 16(b) does not require a statement of underlying facts to support the denial of the water quality permit.

URR relies on the Texas Supreme Court's holding in *Railroad Comm'n v. Alamo Express,* 158 Tex. 68, 308 S.W.2d 843 (1958). In that case, four separate common carriers applied for the same type of amendment to their existing certificates, all of which dealt with identical commodities. The Railroad Commission allowed three of the carriers to adopt the record made before the Commission by the first carrier. Twenty-four other common carriers sued the Railroad Commission in district court to protest the decisions to grant the amended certificates. In each case except the first, the applicants had no opportunity to cross-examine witnesses or present evidence. Moreover, the Commission issued independent orders for the carriers that adopted the agency record without making findings of fact. The Supreme Court held that the Commission had

acted arbitrarily by not hearing each carrier's individual evidence. *Id.* at 844–45.

*Alamo Express* does not control this case. URR is a single entity seeking six different permits, all six of which are necessary to operate the proposed hazardous waste disposal facility. The Commission consolidated the hearings because the six permits were interdependent. URR did not object. The Commission made a single finding of fact describing URR's proposed operation:

[URR] has submitted applications to ... the Texas Water Commission ... for permits to authorize (1) the drilling and leaching of salt in the Boling Salt Dome to create four salt caverns into which solidified waste will be placed, (2) the processing and solidification of hazardous waste to be disposed of within the salt caverns created, and (3) an uncontaminated stormwater collection system and retention pond for emergency and firefighting capabilities with pond overflow to be discharged to an unnamed ditch, thence to Bee Tree Bayou, thence to the San Bernard River,....

Most industrial entities must obtain several permits to implement a single waste disposal operation; the facility for which URR sought permits was no exception. We overrule the second point of error.

### SOLIDIFICATION STANDARD

■ In its fourth and fifth points of error URR complains that: (1) the Commission substituted a new standard for solidification of hazardous waste in place of the existing "paint-filter test"; and (2) the Commission failed to give URR notice of the new standard. Appellant contends that these actions violated constitutional and statutory provisions and procedures. *See* APTRA § 19(e)(1, 3 & 4) (Supp.1991).

While the permit applications were pending before the Commission, Congress banned the disposal of liquid hazardous wastes in landfills and salt caverns. 42 U.S.C.A. § 6924(b) & (c) (Supp.1991). To implement this congressional ban, the Environmental Protection Agency ("the EPA") promulgated a rule requiring owners and

operators of land treatment and disposal facilities to demonstrate the absence of free liquids in a waste stream by using the "paint-filter test." *See* 40 C.F.R. 264.314; 50 Fed.Reg. 18,370. "Free liquids" are those which readily separate from the solid portion of a waste under ambient temperature and pressure. 40 C.F.R. § 260.10; 31 T.A.C. § 335.1 (1989). The Commission adopted the paint-filter test for landfills. *See* T.A.C. § 335.175 (1989). URR presented the Commission with an EPA memorandum suggesting that the paint-filter test could be used to demonstrate the absence of free liquids in the slurry to be injected into the salt caverns.

URR correctly states that an applicant proposing to dispose of hazardous waste in a salt cavern must demonstrate the absence of free liquids by passing the paint-filter test. URR claims that the Commission set forth a new solidification standard when, on July 6, 1989, Chairman Wynne stated that the issue before the Commission was, "whether the solidified material, will ... stay solid and, ... whether once solidified, any of the hazardous materials that are bound up will then subsequently become available to the environment." URR asserts that this new standard was the basis of the order, citing sub-findings 17(b) and (m):

> (b) The Bureau of Economic Geology has expressed guarded concern regarding the structural and hydrologic stability of salt domes for storage of hazardous waste, *unless it is adequately demonstrated that solidification of wastes will be achieved.* [Official Notice Exh. 15–A, 15–B, 15–C] Salt caverns are a viable depository for hazardous waste *if delayed solidification of injected wastes* can be achieved.
>
> \*    \*    \*    \*    \*    \*
>
> (m) No tests which would determine the amount, if any of hazardous waste available to the environment from the solidified mixture were performed.

(Final Order, August 11, 1989, emphasis added). Had the Commission relied solely on the paint-filter test, URR argues, the Commission would have approved its applications.

URR mischaracterizes the paint-filter test as the *only* requirement to be satisfied to obtain an injection well permit. The paint-filter test is a federal regulatory standard that reflects the federal ban on placing liquid hazardous waste in a landfill or salt cavern. To obtain its injection well permits, URR also had to demonstrate that it could protect fresh groundwater. Tex. Water Code Ann. § 27.051(a)(3) (1988).

URR had the burden of proof before the Commission. 31 T.A.C. § 265.2 (1989). Findings of basic fact Nos. 17(b) and (m) state that URR did not meet its burden of proof. Finding (b) cites a study conducted by the Bureau of Economic Geology examining the use of Texas salt domes as potential sites for permanent storage and recommending that waste material stored in a salt cavern must be solidified and must maintain a strength and density equivalent to or greater than salt to enhance the stability of the salt dome.

Under its statutory mandate to protect fresh groundwater, the Commission must be concerned with the long-term stability of hazardous waste slurry and its strength and integrity after injection. URR admits that it had not demonstrated its ability to protect fresh groundwater solely by passing the paint-filter test. We conclude that in addition to the federally mandated paint-filter test, the Commission could require additional assurances of the structural integrity of the waste after injection and its long-term stability in the dome to meet the state mandate for protecting fresh groundwater. The Commission did not violate statutory or constitutional provisions and did not use unlawful procedures when it required URR to prove that the solidified material would stay solid in the cavern and not become available to the environment.

URR argues that "parties must be able to know what is expected of them in the administrative process." *Starr County v. Starr Indus. Serv., Inc.*, 584 S.W.2d 352, 356 (Tex.Civ.App.1979, writ ref'd n.r.e.). We believe that URR had notice that it had to prove its hazardous waste slurry would

solidify so that fresh groundwater would not be threatened. Tex. Water Code Ann. § 27.051(a)(3) (1988). This requirement imposed by the statute did not constitute a new solidification standard. We do not need to address the notice issue raised by URR.

We overrule URR's fourth and fifth points of error and affirm the trial court's judgment.