**SECURED ENVIRONMENTAL MANAGEMENT, INC.,**
Appellant,

v.

**TEXAS NATURAL RESOURCE CONSERVATION COMMISSION, Jeffrey Saitas, and The City of Mont Belvieu,** Appellees.

No. 03–02–00219–CV.

Court of Appeals of Texas, Austin.

Dec. 19, 2002.

Rehearing Overruled Feb. 6, 2003.

Steve McConnico, J. Woodfin Jones, Jane M.N. Webre, Scott, Douglass & McConnico, LLP, Austin, for appellant.

Howard S. Slobodin, Cynthia Woelk, Assistant Attorney General, Natural Resources Division, Austin, for Texas Natural Resource Conservation Commission.

Stephen P. Webb, Gwendolyn Hill Webb, Webb & Webb, Austin, for City of Mont Belvieu.

Before Justices KIDD, B.A. SMITH and YEAKEL.

MACK KIDD, Justice.

In this case, we determine whether a Texas statute, section 361.114 of the Health and Safety Code, which bans hazardous waste disposal in salt-dome formations, is preempted by the Federal Resource Conservation and Recovery Act ("RCRA"). *See* Tex. Health & Safety Code Ann. § 361.114 (West Supp.2003); 42 U.S.C.A. §§ 6901–6991 (West 1995 & Supp.2003). Before the Texas statute was passed, Secured Environmental Management ("SEM") had applied for a permit to dispose of hazardous waste in a salt-dome formation. After passage of the statute, the Texas Natural Resource Conservation Commission [1] (the "Commission") informed SEM that it would no longer consider the aspects of SEM's application dealing with hazardous waste disposal in salt domes and requested that SEM revise its application to omit any mention of salt-dome hazardous waste disposal. In response to the Commission's request, SEM sought a declaratory judgment that section 361.114 was preempted by federal law and an injunction preventing the statute's implementation. The trial court held that 361.114 is not preempted. We agree with the trial court and will affirm.

## BACKGROUND

In 1992, SEM applied to the Commission for a permit allowing a comprehensive waste disposal scheme, part of which involved a plan to store non-liquid hazardous waste in salt-dome formations. At that time, Texas provided by statute that cer-

tain regulatory requirements had to be met before hazardous waste could be deposited in salt domes. Among other things, a license applicant had to demonstrate that: (1) there existed an urgent public necessity; (2) salt-dome disposal was at least as safe as alternative disposal methods; and (3) the project would protect groundwater and public water supplies. Act of June 7, 1991, 72d Leg., R.S., ch. 296, § 1.20, 1991 Tex. Gen. Laws 1251 (amended 2001) (current version at Tex. Health & Safety Code Ann. § 361.114 (West Supp. 2003)). In addition, under the Commission's then-current rules, SEM would have had to explain the appropriateness of disposing of the particular type of waste in a given salt dome, taking into account the unique geology of that salt dome. *See* Tex. Admin. Code §§ 331.121(a), (d), (g) (2002) (superseded by statute, Act effective Sept. 1, 2002, 77th Leg., R.S., ch. 965, § 9.02, 2001 Tex. Gen. Laws 1965) (codified at Tex. Health & Safety Code Ann. § 361.114 (West Supp.2003)). SEM faced a substantial statutory and regulatory hurdle in obtaining its permit.

The federal government has also placed substantial limitations on licenses for salt-dome hazardous waste disposal. RCRA, the federal omnibus statute regarding hazardous waste disposal, provides strict limitations on the licensing of salt domes for hazardous waste disposal. RCRA's provisions serve as minimum regulations; the states are generally empowered to adopt more strict regulations regarding hazardous waste disposal. *See* 42 U.S.C.A. § 6929.

---

**1.** Effective September 1, 2002, the Texas Natural Resource Conservation Commission's name was changed to the Texas Commission on Environmental Quality. *See* Act of June 15, 2001, 77th Leg., R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1985. Until January 1, 2004, the Commission has the discretion to use either name as it phases in the new nomenclature. Because the docketing statements name the TNRCC as a party, we will continue to use that designation.

If approved, SEM's program would have been the first use of salt-dome caverns to store hazardous waste in Texas. Salt-dome formations are mounds or plugs of salt buried in the earth's upper strata. They occur in areas where the soil is relatively porous and prone to groundwater contamination; sometimes they contain natural deposits of oil and natural gas. One method for exploiting salt domes for industrial use is "solution mining." A borehole is drilled deep into the salt, and water is pumped in to dissolve a portion of the salt. When the solution is extracted, a cavern remains inside the salt deposit. This method is traditionally used for storing reserves of natural gas and oil. Experience with the storage of fossil fuels suggests that such solution-mined caverns are not stable. They tend gradually to close because the salt itself tends to move. This movement can cause the cavern walls to crack, allowing whatever is contained inside to leach out into the surrounding area. Because of this danger, both the federal and state governments have created statutes carefully limiting any proposed use of solution-mined salt-dome caverns to dispose of hazardous wastes.

This Court has twice decided cases dealing with applications for this type of disposal program. *Hunter Indus. Facilities v. Texas Nat. Res. Conservation Comm'n*, 910 S.W.2d 96 (Tex.App.-Austin 1995, writ denied) (upholding Commission's rejection of applications to dispose of non-liquid hazardous waste in solution-mined salt domes); *United Res. Recovery v. Texas Water Comm'n*, 815 S.W.2d 797 (Tex.App.-

Austin 1991, writ denied) (upholding Commission's rejection of plan to dispose of semi-solid hazardous waste in salt domes). The potential dangers involved in salt-dome disposal are considerable; only strict enforcement of federal and state waste-disposal systems can adequately protect the public health. *See Hunter*, 910 S.W.2d at 101; *United Res.*, 815 S.W.2d at 804 (holding that Water Commission could require *stronger showing* of salt dome's structural integrity than required by federal guidelines).

In 1999, the Texas Legislature banned the disposal of hazardous waste, solid or liquid, in solution-mined salt domes or sulphur mines.[2] Accordingly, the Commission issued a letter to SEM indicating that it was no longer possible to grant a permit for salt-dome hazardous waste disposal. The Commission requested that SEM revise its application to remove any plans to dispose of hazardous waste in salt domes. SEM chose not to amend its applications; instead, SEM brought this declaratory judgment action against the Commission to establish that the Texas statute was preempted by the applicable federal statute, RCRA.

SEM moved for summary judgment, contending that section 361.114 is preempted because it conflicts with RCRA's stated object and purpose. The Commission and the City of Mont Belvieu[3] both filed cross-motions for summary judgment against SEM on the ground that section 361.114 did not conflict with the object and purpose of RCRA. The trial court granted the Commission's motion,

---

**2.** Sulphur mines are cleared through a solution mining process similar to that used to clear out salt-dome caverns for oil and natural gas storage. Only solution-mined salt domes are implicated in this appeal.

**3.** The City of Mont Belvieu, which is situated near a large salt-dome formation heavily used

by the oil and gas industry, intervened in the declaratory judgment action. Because we do not understand their legal position to be different from that taken by the Commission, we will deal with both the City's and the Commission's arguments collectively.

held that its action on the Commission's motion impliedly disposed of any issues raised in Mont Belvieu's motion, and denied SEM's motion. SEM now appeals, arguing that the statute is, as a matter of law, preempted by federal law.

SEM argues that section 361.114 is preempted because, by specifically addressing salt domes in RCRA, Congress has mandated that they remain a potential means of disposing of hazardous waste in any waste disposal regime promulgated by the federal Environmental Protection Agency or an authorized state such as Texas. The Commission responds that, in accordance with RCRA's allocation of power between state and federal government, Texas has only enacted a *more stringent* requirement under its general power to regulate hazardous waste placed into landfills. We agree with the Commission.

## DISCUSSION

### The Resource Conservation and Recovery Act

In 1976, responding to growing concern about the disposal of solid and hazardous waste, Congress passed RCRA, which exhorted the Environmental Protection Agency ("EPA") to create national standards for the storage and disposal of hazardous waste materials.

RCRA creates "a viable Federal–State partnership" to carry out its purposes. 42 U.S.C.A. § 6902(a)(7) (West 1995). It does so principally through sections 6926 and 6929. *Id.* §§ 6926, 6929 (West 1995). Section 6929, RCRA's savings provision, empowers states to adopt regulations "more stringent" than their federal equivalents. Section 6926 allows the EPA to "authorize" states to carry out their own hazardous waste programs "in lieu of" the federal program. An authorized state becomes the sole permitting authority for the storage, treatment, or disposal of hazardous waste within that state. *Id.* § 6925(b). Texas is an "authorized state" under section 6926. 40 C.F.R. § 272.2201 (2002). Thus, RCRA creates minimum standards below which the states may not set their waste disposal criteria, provides for the states to adopt more stringent standards, and allows some states, including Texas, to completely administer their own waste disposal programs.

In 1986, concerned that the EPA and various states had moved too slowly in creating workable waste disposal guidelines, Congress added a number of provisions creating standards to deal with particular hazardous waste problems. *See, e.g.,* 42 U.S.C.A. §§ 6924(b)–(y) (West 1995 & Supp.2003). These provisions identified certain materials and disposal methods as impermissible, while imposing intermediate restrictions on certain other materials and disposal methods. For example, RCRA provides that "land disposal . . . should be the least favored method for managing hazardous wastes," as that method poses a "substantial risk to human health and the environment." *Id.* § 6901(b)(7) (West 1995). RCRA defines "land disposal" to include many different means for burying or obscuring waste, including salt-dome formations. *Id.* § 6924(k). RCRA defines hazardous waste as "a solid waste . . . which . . . may cause, or significantly contribute to an increase in mortality or an increase in serious irreversible . . . illness or . . . pose a substantial present or potential hazard to human health or the environment when improperly treated, stored . . . or otherwise managed." *Id.* § 6903(5)(a)–(b) (West 1995). The EPA has the power, after a contested public hearing, to place substances on the list of hazardous waste subject to RCRA's provisions. *Id.* § 6921(a). In addition, certain wastes are denominated hazardous wastes by specific

statutory provision. *See, e.g., id.* § 6921(e)(1) (declaring halogenated dioxins and halogenated dibenzofurans to be hazardous waste). Thus, the provisions of RCRA governing "hazardous waste" provide that any substance either specifically designated by Congress to be hazardous, or deemed by the EPA to be hazardous, shall at least be disposed of under the minimum safety standards set out by RCRA.

### The Texas Health and Safety Code, section 361.114

Until the 2001 amendment, the Texas Health and Safety Code had provided extensive statutory and regulatory requirements for permitting hazardous waste disposal in salt domes. These included an affirmative showing of necessity and a demonstration that groundwater would not be affected by any hazardous waste placed in a salt dome.[4]

The legislature has, however, superseded that detailed statutory provision with the following:

> Sec. 361.114. **PROHIBITION OF DISPOSAL OF HAZARDOUS WASTE INTO CERTAIN GEOLOGICAL FORMATIONS.**
>
> The commission by rule *shall prohibit* the storage, processing, or disposal of hazardous waste in a solution-mined salt dome cavern or a sulphur mine

Act effective Sept. 1, 2002, 77th Leg., R.S., ch. 965, § 9.02, 2001 Tex. Gen. Laws 1965 (codified at Tex. Health & Safety Code Ann. § 361.114 (West Supp.2003)) (emphasis added). Thus, the legislative amendment creates an outright ban on disposing of hazardous waste in solution-mined salt domes. The Health and Safety Code defines "hazardous waste" to include the same substances included in RCRA's omnibus list of dangerous substances. *Id.* § 361.003(12) (West 1995). Both the Health and Safety Code and RCRA, by definition, regulate disposal of the same substances. The only difference material to this case is in the specific provisions regarding salt-dome waste disposal.

### Preemption Analysis

Because this suit was bought for declaratory judgment based only on the letter issued by the Commission, we have no administrative record nor any information specific to SEM's particular application. Rather, SEM argues that the Texas statute is preempted as a pure question of law, based on the text of the federal and Texas statutes involved. Therefore, we must determine whether, under RCRA's specific provisions and general preemption analysis, Texas's statutory restriction on solid hazardous waste disposal is preempted by RCRA.

The laws of the United States are the "supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. If a state law conflicts with federal law properly enacted by the Congress within its constitutional authority, the state law is preempted and has no effect. *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). In order to preserve the states' dignity and autonomy, however, the courts have usually presumed that state laws will not be preempted in areas over which the states have traditionally exercised their independent authority. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 229–30, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). When Congress clearly manifests

---

4. For a full discussion of the former statute, see *Hunter Industrial Facilities v. Texas Natural Resource Conservation Commission,* 910 S.W.2d 96 (Tex.App.-Austin 1995, writ denied).

its intent to preempt state regulation, however, the supremacy clause grants it that power. *See, e.g., Boggs v. Boggs,* 520 U.S. 833, 844, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997).

The party asserting federal preemption bears the burden of proof. *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *Boon Ins. Agency, Inc. v. American Airlines, Inc.,* 17 S.W.3d 52, 55 (Tex.App.-Austin 2000, pet. denied), *cert. denied,* 531 U.S. 1113, 121 S.Ct. 858, 148 L.Ed.2d 772 (2001). Preemption can be demonstrated either explicitly or implicitly. Congress may expressly preempt state law in its enactments. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). A federal statute may impliedly preempt state law if Congress states an intent to occupy the field of regulation in a particular area, or if a state law actually conflicts with federal law or regulations. *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). A state law may be said to conflict with federal law in two situations: (1) when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941), and (2) when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

Federal statutes do not always preempt every aspect of regulation over a particular subject-matter. Many, including RCRA, have "savings clauses" that, instead of preempting state law outright, reserve to the states some specified degree of authority. *E.g.,* 42 U.S.C.A. § 6929. Any state action that is not within the scope of the clause is expressly preempted.

However, even when a federal statute's preemption clause does not clearly bar a state law, or the state law might be considered to be within the statute's savings clause, ordinary principles of implied preemption may still apply. *Geier v. American Honda Motor Co.,* 529 U.S. 861, 873–74, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Although the overall goals of the state and federal law are the same, state law may be preempted in these situations "if it interferes with the methods by which the federal statute was designed to reach [its] goal." *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). When assessing the implied preemptive effect of a federal statute on a state statute, we must ask whether the statute is consistent both with the federal statute's structure and purpose, taken as a whole, and its objectives and policies. *Gade v. National Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 89, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). We are to look not so much to the legislature's professed purpose in passing the statute, but at the "effects of the law." *Id.* at 90, 112 S.Ct. 2374. A state statute will not be saved from preemption merely because it has some effect outside the scope of the federal statute. *Id.* Thus, in this case, we will consider whether "the practical impact" of section 361.114 interferes with the goals and methods of RCRA. *See Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (citing *Lacoste v. Department of Conservation of State of La.,* 263 U.S. 545, 550, 44 S.Ct. 186, 68 L.Ed. 437 (1924)).

Whether RCRA preempts a particular state hazardous waste statute, then, depends on whether there exists an actual conflict between federal policy and local regulatory decisions. Some cases might require fact finding on the scope and effect of the state and federal regulations. *See*

*Blue Circle Cement, Inc. v. Board of County Comm'rs,* 27 F.3d 1499, 1508–09 (10th Cir.1994) (RCRA preemption question depends on whether, under *Gade,* there is a practical conflict between federal and local policy). The parties have stipulated that this would be the first time that salt-dome hazardous waste disposal has been attempted in the United States; there is no germane federal or state waste disposal program actually in existence. We have only RCRA's statutory language on which to base our determination. SEM takes the position that, read in light of RCRA's congressional findings, the specific language of section 6924(b), which establishes special rules regarding hazardous waste disposal in salt domes, evinces an affirmative Congressional policy that salt-dome disposal remain a potential means for disposing of solid hazardous waste. Therefore, according to SEM, section 361.114 is preempted because it conflicts with RCRA's object and purposes.

RCRA prohibits dumping and open waste-disposal sites, 42 U.S.C.A. § 6902(a)(3)–(7), but still allows for hazardous waste "treatment, *storage,* and disposal." *See id.* §§ 6903(3), (33), (34) (emphasis added). SEM considers this language to constitute the underlying policy of RCRA: to create a national waste disposal policy which includes salt-dome hazardous waste disposal. Because RCRA limits, rather than bans, land disposal, SEM takes the position that Congress created a requirement that land disposal be an element of any waste-disposal program under the authority of the EPA or the authorized states.

Following the 1984 amendments, RCRA has included a distinct subsection addressing salt-dome disposal for liquid and solid hazardous waste.

**(b) Salt dome formations, salt bed formations, underground mines, and caves**

(1) Effective on November 8, 1984, the placement of any noncontainerized or bulk liquid hazardous waste in any salt dome formation, salt bed formation, underground mine, or cave is prohibited until such time as

   (A) the Administrator has determined, after notice and opportunity for hearings on the record in the affected areas, that such placement is protective of human health and the environment,

   (B) the Administrator has promulgated performance and permitting standards for such facilities under this subchapter, and;

   (C) a permit has been issued under section 6925(c) of this title for the facility concerned.

(2) Effective on November 8, 1984, the placement of any hazardous waste other than a hazardous waste referred to in paragraph (1) in a salt dome formation, salt bed formation, underground mine, or cave is prohibited until such time as a permit has been issued under section 6925(c) of this title for the facility concerned.

(3) No determination made by the Administrator under subsection (d), (e), or (g) of this section regarding any hazardous waste to which such subsection (d), (e), or (g) of this section applies shall affect the prohibition contained in paragraph (1) or (2) of this subsection.

(4) Nothing in this subsection shall apply to the Department of Energy Waste Isolation Pilot Project in New Mexico.

42 U.S.C.A. § 6924(b). Liquid hazardous waste may not be disposed of in a salt dome under any circumstances until the EPA or the state has established that, in general, it can be disposed of safely. *See Natural Res. Def. Council, Inc. v. United States Envtl. Prot. Agency*, 907 F.2d 1146, 1164–65 (D.C.Cir.1990) (rejecting EPA rule that would have issued salt-dome liquid-waste permits on case-by-case basis). By contrast, non-liquid waste is subject to the permitting and policy decisions of either the EPA or the authorized state. 42 U.S.C.A. § 6924(b). Section 6924(b)(1) prohibits disposal of liquid hazardous waste in salt domes until such time as the licensing authority shall have adopted general rules and standards ensuring acceptable safety. Section 6924(b)(2) states that any hazardous waste not covered by paragraph one is "prohibited until such time as a permit has been issued under section 6925(c)."

SEM reads this statutory language to say that, because section 6924(b)(2) does not absolutely prohibit salt-dome disposal for solid hazardous waste, RCRA comprises an affirmative Congressional mandate that such disposal has been expressly selected as a *potentially safe* means of waste disposal. Therefore, SEM concludes, Texas's section 361.114 conflicts with the object and purpose of RCRA because the Legislature has enacted an *outright ban* on a disposal method permitted by RCRA. We disagree.

The Texas Health and Safety Code adopts RCRA's definition of hazardous waste. Tex. Health & Safety Code Ann. § 361.003(12) (West 2001) (defining hazardous waste as solid waste identified or listed as hazardous waste by EPA under RCRA's provisions). Section 361.114, then, bans hazardous waste disposal in "a solution-mined salt dome cavern or a sul-

phur mine." *Id.* § 361.114. This statute must be read in context with three applicable sections of RCRA defining the scope of RCRA's disposal policy regarding salt domes: 6925(c), under which the proper authority may issue disposal-site permits; 6925(k), which states that land disposal, including among other things salt-dome disposal, should only be permitted when there is a factual finding of safety to human health and the environment; and 6924(b), which indicates that states may issue permits for disposal of hazardous waste in "any salt dome formation, salt bed formation, underground mine, or cave" only if it finds that such disposal protects human health and the environment as required by section 6925(c). 42 U.S.C.A. §§ 6924(b), (k), 6925(c).

Further, the applicable sections of RCRA create an outright ban on disposal of *liquid hazardous waste* in a set of geologic formations including salt domes, *id.* § 6924(b)(1), and a corresponding disapproval of solid-waste disposal in the same formations. *Id.* § 6924(b)(2). This is as specific an articulation of federal policy regarding salt-dome disposal as we have been able to glean from RCRA's plain language. We agree with SEM that RCRA seems to envisage the *possibility* that it might be safe at *some* point in time to permit the use of *some* of the underground geologic formations referenced in section 6924 to dispose of *some* hazardous waste. However, section 6929 explicitly reserves to the states the opportunity to enact more stringent standards. The Texas Legislature has made a decision to ban hazardous waste disposal in two of the geologic formations listed in section 6924. It has, furthermore, focused specifically on formations created through solution mining.[5] We construe this to be a precise,

---

5. We note that in Europe salt domes that have

been mechanically mined, rather than solu-

nuanced extension of RCRA's outright ban on liquid hazardous waste, taken together with the regulatory oversight ceded to the states by Congress.

SEM draws our attention to a line of cases it claims stands for the proposition that any ban on a particular means of hazardous waste disposal violates the object and purpose of RCRA and is, therefore, preempted. These decisions have voided local government decisions that contravened actual federal programs and waste disposal decisions. *See, e.g., Rollins Envtl. Servs., Inc. v. Parish of St. James,* 775 F.2d 627, 634 (5th Cir.1985) (parish ordinance purporting to ban disposal of "commercial solvents" preempted by EPA determination that PCBs could be disposed of safely); *ENSCO, Inc. v. Dumas,* 807 F.2d 743, 745 (8th Cir.1986) (county ordinance banning disposal of "acute hazardous waste" despite EPA policy allowing hazardous waste disposal); *Ogden Envtl. Servs. v. City of San Diego,* 687 F.Supp. 1436, 1448 (S.D.Cal.1988) (denial of city permit for waste combustion facility preempted by EPA's determination that proposed incinerator was sufficiently safe). The courts, using object-preemption analysis, held that even a local regulation that was stricter than a federal standard might, in some cases, be preempted. *E.g., ENSCO,* 807 F.2d at 745; *Rollins,* 775 F.2d at 634. In these cases, however, there existed a real danger that, by excluding waste from their territories, local governments would be able to avoid their responsibility for disposing of toxic waste generally. *See, e.g., Warren County v. North Carolina,* 528 F.Supp. 276, 289 (E.D.N.C. 1981). Thus, under SEM's authorities, RCRA may preempt state policies that are more stringent than federal requirements, *but only* if there exists an affirmative federal order or program. *See Blue Circle*

*Cement,* 27 F.3d at 1508–09 (remanding for fact finding whether specific state statute interfered with technical implementation of actual federal standards). These decisions extend RCRA's preemptive scope in order to protect defined federal programs and policies undertaken specifically to fulfill RCRA's ultimate intent and purpose.

While we might in the abstract agree with the proposition that more stringent local government regulation should not be allowed to impede federal waste disposal programs, this record does not include even the outline of a federal program against which we might measure Texas's narrow legislative enactment. Because we are not faced with the problem dealt with by SEM's line of authorities, the question before us is whether Texas has acted within the power reserved to it under section 6929.

Because we find no specifically articulated Congressional intent to *require* solid hazardous waste disposal in salt domes, we must address the preemption question in terms of RCRA's savings clause. Section 6929 reads that states and local governments "may not impose any requirements less stringent" than those specifically provided for in RCRA, and at the same time state governments retain express authority to create regulations "more stringent" than those specifically provided in RCRA. 42 U.S.C.A. § 6929. Section 361.114, by placing a ban on certain means of waste disposal, creates a more stringent waste disposal regulation than RCRA's and, therefore, falls within section 6929's scope and is saved.

While Texas's section 361.114 may stand in some tension with RCRA, we conclude, as did the trial court, that they are not in conflict with one another. The Texas Leg-

---

tion mined, have been used for waste disposal. *See Hunter,* 910 S.W.2d at 100 n. 5.

islature has simply extended the scope of RCRA's ban on an experimental and untested waste-disposal procedure; furthermore, the state .ban reaches only underground areas cleared through solution-mining. If Congress has the ability to regulate waste disposal by creating an outright ban on liquid hazardous waste disposal in certain geologic formations, then Texas's power to enact more stringent regulations, pursuant to the savings clause, must include the ability to extend that ban in order to meet the same underlying policy concerns. We cannot, therefore, say that the Texas statute is in conflict with RCRA's general policy of disfavoring ground disposal, read in light of its specific ban on liquid hazardous waste disposal in salt domes and other geologic formations.

It may be true, as SEM contends, that disposing of hazardous waste within the confines of a salt dome is safer than committing it directly to the ground. SEM refers us to the legislative history of the 1984 amendment in order to imply a purpose inherent in section 6924(b) to ensure that salt-dome disposal is available. This does not dissuade us from our reading of the statute's plain language. There is a presumption that Congress did not intend to preempt the state's traditional regulatory activities. *Geier*, 529 U.S. at 948 n. 22, 120 S.Ct. 1913; *Rice*, 331 U.S. at 229–30, 67 S.Ct. 1146. Applying this presumption leads us to the conclusion that Texas is entitled to enact more stringent requirements than those provided in RCRA, including creating a narrowly crafted ban on a disapproved method of hazardous waste disposal.

Both parties have drawn our attention to an analysis of whether certain waste-disposal methods are "more favored" or "less favored" by RCRA. Although we concede that this may be an important issue in determining whether a state law or regulation actually interferes with or defeats an established federal waste disposal program, *see Blue Circle Cement*, 27 F.3d at 1508–09, it is not determinative in our reading of the two statutes as they have been presented to us under the facts of the case at bar.

Moreover, Texas enjoys a special status under RCRA in that it is an "authorized state," whose regulations may be adopted "in lieu" of the EPA's regulatory oversight.[6] 42 U.S.C.A. § 6296. A permit application under section 6925(c) addressed either to the EPA or an authorized state agency is not a guarantee; it will only issue when an applicant overcomes the presumption that land disposal should not be undertaken. *Id.* 6925(c). Section 6925(c) provides that permits will contain "such terms and conditions as the Administrator (or the State) determines necessary to protect human health and the environment." *Id.* This reinforces our conclusion: the actions of the state of Texas, as an "authorized state," are not preempted by the same Congressional enactment which expressly allowed for the creation of Texas as an authorized state. *See Hazardous Waste Treatment Council v. Reilly*, 938 F.2d 1390, 1396 (D.C.Cir. 1991) (noting that section 6929 explicitly gives states great deal of autonomy limited primarily by technical determinations of EPA).

Section 361.114 falls squarely within the power granted by RCRA to the states: to adopt more stringent requirements than those contained in RCRA itself or adopted by the EPA. Our determination is based on the breadth of RCRA's actual language, not on any assessment of the relative tech-

---

**6.** The parties have joined issue on the potential effect of any EPA action. However, in the absence of any action by the EPA, this issue is not before us.

nical merits of different waste disposal methods. Accordingly, we overrule SEM's issue.

## CONCLUSION

Absent any mention in the record of a practical federal program aimed at disposing of solid hazardous waste in salt domes, we hold that section 361.114 does not conflict with RCRA's stated object and purpose. Because section 361.114 is a "more stringent" regulation, it falls within RCRA's savings clause and is not preempted. Accordingly, we affirm the trial court's grant of summary judgment.